**UNITED STATES of America,**
**Plaintiff,**

v.

**TWENTIETH CENTURY-FOX FILM CORPORATION, Warner Bros. Pictures, Inc., Warner Bros. Distributing Corporation, Universal Pictures Company, Inc., United World Films, Inc., RKO Radio Pictures, Inc., Columbia Pictures Corporation, Screen Gems, Inc., Defendants.**

No. 14354.

United States District Court
S. D. California, Central Division.

Dec. 5, 1955.

Findings and Judgment Jan. 10, 1956.

Mitchell, Silberberg & Knupp, Guy Knupp, Macklin Fleming and Robert Rifkind, Los Angeles, Cal., for defendants RKO Radio Pictures, Inc., Columbia Pictures Corp., and Screen Gems, Inc.

YANKWICH, Chief Judge.

The action was originally instituted by the Government [1] against six motion picture producers and six distributors of feature motion pictures, charging violation of § 1 of the Sherman Anti-Trust Act.[2] On September 12, 1955 a consent decree was entered against Republic Pictures Corp., a producer and its wholly owned subsidiary, Republic Productions, Inc., a distributor. On September 22, 1955 a consent decree was entered against Pictorial Films, Inc., and Films, Inc., distributors.

Involved in the case is the legality of the distributing methods of the defendants as they relate to the 16mm films.

Before outlining in greater detail the pleadings and issues in the case, we give the following accepted definitions of the trade terms used.

"Sixteen millimeter films" are motion picture films 16mm in width, in contrast with "standard films" which are 35mm in width. "Feature films" are motion pictures four or more reels in length other than those of strictly educational, religious or commercial character. "Theatres" are motion picture houses in which feature films are exhibited to the public for profit. "Theatrical exhibition" is any showing of a motion picture for the profit of an exhibitor. "Exhibitor" includes all persons, firms, corporations and public agencies engaged in the exhibition of motion pictures. "Clearance" is protection granted to an exhibitor or exhibitors by limiting the terms on which motion pictures may be exhibited by other exhibitors. "Merchants' free shows" are exhibitions of motion picture films sponsored by merchants to enhance their good will and to obtain publicity. They are open to the public, no admission being charged. "Roadshow men"

---

Samuel Flatow, Sp. Asst. to Atty. Gen., James M. McGrath, Los Angeles, Cal., Daniel H. Margolis and Leonard R. Posner, Trial Attys., Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

Musick, Peeler & Garrett, O'Melveny & Myers, Homer I. Mitchell and Warren M. Christopher, Los Angeles, Cal., for defendant Twentieth Century-Fox Film Corp.

Freston & Files, O'Melveny & Myers, Homer I. Mitchell and Warren M. Christopher, Los Angeles, Cal., for defendants Warner Bros. Pictures Inc., and Warner Bros. Distributing Corp.

O'Melveny & Myers, Homer I. Mitchell and Warren M. Christopher, Los Angeles, Cal., for defendants Universal Pictures Co., Inc., and United World Films, Inc.

---

1. 15 U.S.C.A. § 4.

2. 15 U.S.C.A. § 1.

are itinerant exhibitors who make a profit from showing motion pictures to the public for admission charges. "Coin-operated machine" is a mechanical device containing a 16mm film, automatically projecting it upon insertion of a coin and arranged so as to make the projection viewable by one person at a time. Other terms will be defined as the discussion progresses.

## I

### The Pleadings and Issues

The corporate defendants are incorporated either under the laws of Delaware or New York. All except one, Republic Productions, Inc., have their principal place of business in New York City, New York, but each of them transacts business and is found in the Southern District of California.

The producing companies named as defendants remaining in the case are: Twentieth Century-Fox Film Corporation (to be referred to hereinafter as Fox); Warner Bros. Pictures, Inc. (to be referred to hereinafter as Warner); RKO Radio Pictures Inc. (to be referred to hereinafter as RKO); Columbia Pictures Corporation (to be referred to hereinafter as Columbia); and Universal Pictures Company, Inc. (to be referred to hereinafter as Universal).

RKO, in addition to producing motion pictures, also distributes them, including motion pictures in 16mm width. Warner, Columbia, and Universal each has a wholly-owned subsidiary engaged in the distribution of motion pictures, including 16mm pictures. These subsidiaries, named as defendants, are, respectively; Warner Bros. Pictures Distribution Corporation, Screen Gems, Inc., and United World Films, Inc. The two other distributing companies named as defendants are: Films, Inc., (to be referred to hereinafter as Films) and Pictorial Films, Inc. (to be referred to hereinafter as Pictorial). Both defendants Films and Pictorial are engaged primarily in the distribution of 16mm motion picture films. Films distributes the 16mm product of, among others, the defendants Fox and Warner.

Six exhibitor associations and an organization representing all phases of the industry (Council of Motion Pictures Organizations, Inc., to be referred to hereinafter as COMPO) are named as co-conspirators in this action. Of the six exhibitor associations, two, Theatre Owners of America, Inc. (to be referred to hereinafter as TOA) and Allied States Association of Motion Picture Exhibitors (to be referred to hereinafter as Allied) are national trade associations composed primarily of local, regional or state associations of theatre owners. The other four exhibitor organizations, Independent Theatre Owners Association, Inc., Metropolitan Motion Picture Theatres Association, Inc., Southern California Theatre Owners Association and Pacific Coast Conference of Independent Theatre Owners, are regional exhibitor associations.

The complaint charges that beginning some years prior to 1945, the exact date being unknown, and continuously since 1945, the defendants have been and are now engaged in an unlawful conspiracy in restraint in interstate trade and commerce in 16mm feature films. More specifically, it is charged:

"29. During the period of time covered by this complaint, and for the purpose of effectuating the aforesaid combination and conspiracy, the defendants did the things alleged in paragraph 28 hereof and entered into written and oral agreements containing restrictions hereinafter set forth, limiting the purposes for, locations at, times when and conditions under which sixteen millimeter films may be exhibited.

"30. The aforesaid restrictions on sixteen millimeter feature film exhibitions consist of the following:

"(a) Refusing to license any one to telecast sixteen millimeter feature films;

"(b) Refusing to license others to exhibit sixteen millimeter feature

films in locations which are open to the public within a zone, usually ten miles in radius, around any estab-lished 35 millimeter theatre;

"(c) Restricting licenses for exhibition of sixteen millimeter feature films in churches, schools, clubs, hotels, and drive-in theatres by limitations upon admission prices, advertising, categories of persons to be admitted, or hours of showing.

"(d) Imposing arbitrary and excessive clearances between the first release of a feature motion picture of 35 millimeter width and its exhibition on sixteen millimeter films;

"(e) Refusing to license others to exhibit sixteen millimeter feature films at free merchants' shows, taverns, or in coin-operated machines and refusing to license roadshow men;

"(f) Reserving for each of the defendants severally, or for some of them jointly, the right to approve or disapprove each location for the exhibition of sixteen millimeter feature films produced or distributed by such defendant or defendants, before or after the licensing of such location by distributors or dealers, coupled with the right to arbitrarily abrogate any license granted pursuant to a given location approval; and

"(g) Granting or withholding licenses to exhibit sixteen millimeter feature films in conformity with lists of locations 'approved' or 'disapproved' by the defendants or some of them.

"31. The defendants have maintained an intricate system to police and enforce, and with the assistance

of Theatre Owners of America, Inc., have policed and enforced, the license restrictions imposed upon exhibitors of sixteen millimeter feature films, and have blacklisted or boycotted exhibitors who disregard such restrictions."

The effects claimed for the alleged illegal actions of the conspirators are stated, generally, to be: (a) suppression of telecasting of the better feature films to television audiences; (b) unreasonable restraint of competition in the interstate distribution of feature films; (c) foreclosing actual and potential exhibitors of 16mm feature films from significant parts of the United States market, and (d) denying to persons living in theatreless towns or in institutions (both governmental and other) which prohibit their inhabitants to leave their premises the opportunity to see anything but outmoded feature films.

In their separate answers the defendants denied these allegations. Their proof in the record was directed to showing that whatever restrictive practices existed as to the exploitation of 16mm feature films were the result not of concerted action between the producers or the producers and distributors, and/or unindicted co-conspirators, but were dictated by the particular exigencies and needs of the market of each producing company, and that they were "reasonable" in the circumstances.

## II

### The Concept of Reasonableness

The object of the Sherman Act was stated in one of the older cases to be ■ "to preserve the right of freedom to trade."[3] Later cases have stressed this object.[4] However, the Sherman Act

3. United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992.

4. Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 58, 31 S. Ct. 502, 55 L.Ed. 619; Ramsay Co. v. Associated ·Bill Posters of U. S. and·

Canada, 1923, 260 U.S. 501, 512, 43 S. Ct. 167, 67 L.Ed. 368; United States v. American Linseed Oil Co., 1923, 262 U.S. 371, 388, 43 S.Ct. 607, 67 L.Ed. 1035; Paramount Famous-Lasky Corp. v. United States, 1930, 282 U.S. 30, 42–43, 51 S.Ct. 42, 75 L.Ed. 145; Sugar Institute, Inc., v. United States, 1936,

condemns only "unreasonable" restraints.[5] The Supreme Court has read the concept of "reasonableness" as it existed at common law into the Act.[6] This concept applies to all practices which were not at common law, and which the courts do not now consider illegal *per se*.[7] This phase of the problem is of pri-

297 U.S. 553, 597–598, 56 S.Ct. 629, 80 L.Ed. 859; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 495–498, 60 S.Ct. 982, 84 L.Ed. 1311; Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 1941, 312 U.S. 457, 465–466, 668, 61 S.Ct. 703, 85 L.Ed. 949; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 722–723, 64 S.Ct. 805, 88 L.Ed. 1024; Associated Press v. United States, 1945, 326 U.S. 1, 12, 65 S.Ct. 1416, 89 L.Ed. 2013; Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 715–716, 68 S.Ct. 793, 92 L.Ed. 1010; C–O–Two Fire Equipment Co. v. United States, 9 Cir., 1952, 197 F.2d 489, 495–498.

5. Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 406–407, 31 S.Ct. 376, 55 L.Ed. 502; Standard Oil Co. of New Jersey v. United States, supra, Note 4, 221 U.S. 1, 54–59, 31 S.Ct. 502; United States v. American Tobacco Co., 1911, 221 U.S. 106, 179, 31 S.Ct. 632, 55 L.Ed. 663; Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683; Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 213–222, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 498–502, 60 S.Ct. 982, 84 L.Ed. 1311; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 227–228, 67 S.Ct. 1560, 91 L.Ed. 2010; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 400–402, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 144–147, 156–158, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Columbia Steel Co., 1948, 334 U.S. 495, 521–523, 68 S.Ct. 1107, 92 L.Ed. 1533; Standard Oil Co. of Cal. and Standard Stations v. United States, 1949, 337 U.S. 293, 312–313, 69 S.Ct. 1051, 93 L.Ed. 1371; American Federation of Tobacco Growers, Inc., v. Neal, 4 Cir., 1950, 183 F.2d 869, 873–874; Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 614–615, 73 S.Ct. 872, 97 L.Ed. 1277; Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 1954, 210 F.2d 732, 743–744.

6. William L. Letwin, The English Common Law Concerning Monopolies, 1954,

21 U. of Chi.L.Rev. 355; Apex Hosiery Co. v. Leader, supra, Note 5, 310 U.S. at page 497, 60 S.Ct. at page 994; Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236, 238; Blue Bell Co. v. Frontier Refining Co., 10 Cir., 1954, 213 F.2d 354, 358.

7. Comment, The *Per Se* Illegality of Price Fixing, 1952, 19 U. of Chi.L.Rev. 837; Edward H. Mason, Workable Competition versus Workable Monopoly in Business Practices Under Federal Antitrust Laws, 1951 Symposium, 67. The tendency to declare certain practices restraints *per se* has led some critics to postulate an apparent conflict between it and the doctrine of reasonableness or even a repudiation of it. See, S. Chesterfield Oppenheim, 1952, Federal Antitrust Legislation: Guide Post to a Revised National Antitrust Policy, 50 Mich. L.Rev. 1140, 1148–1164; Thomas E. Sunderland, Antitrust Developments, A New Era for Competitive Pricing, 1955, 41 A.B.A.J. 113. However, what the courts did was to determine that certain practices, *such as price-fixing*, were considered monopolistic at common law. So they held that when they are shown to exist the inquiry is at an end. Apex Hosiery Co. v. Leader, supra Note 4, 497–498. See, Alfred E. Kahn, 1953, Standards for Antitrust Policy, 67 Harv. L.Rev. 28; Alfred E. Kahn, 1954, A Legal and Economic Appraisal of the "New" Sherman and Clayton Acts, 63 Yale L.J. 293; Walter Adams, 1954, The "Rule of Reason": Workable Competition or Workable Monopoly, 63 Yale L.J. 348. See, Milton Handler, Recent Antitrust Developments, 9 The Record of the Association of the Bar of the City of New York, 1954, 171; Report of the Attorney General's National Committee to study the antitrust laws, 1955. And on the whole policy of the antitrust laws, see, Kenneth S. Carlston, 1951, Antitrust Policy: A Problem in State Craft, 60 Yale L.J. 1073; Kenneth Carlston, Rule of the Antitrust Law in the Democratic State, 1952, 47 N.W.L. Rev. 587; Kenneth S. Carlston, 1955, Basic Antitrust Concepts, 53 Mich.L.Rev. 1033. As to the motion picture problem, see, John R. McDonough, Jr. & Robert L. Winslow, The Motion Picture Industry: United States v. Oligopoly, 1949, 1 Stan.L.Rev. 385.

mary importance in this case. The Government's complaint alleges that by the practices charged in the complaint,

"competition in the interstate distribution and exhibition of feature films has been *unreasonably restrained.*" (Emphasis added.)

However, the Government's testimony was directed to proof of (a) the existence of the restrictions and (b) that they were the result of a conspiracy on the part of the defendants and others. No *direct* proof was offered by the Government to show that the restraints *were unreasonable,* the Government contending that unreasonableness could be inferred from the nature of the practices. The reasonableness of the restraints is a cardinal fact in a case of this character. The most benign agreement concerning trade,—the ordinary manner in which an industry selects its custom, and makes its decision to deal or not to deal with others,—restrains, to some extent, whether this be the result of the individual action of one or the concerted action of many.

 As stated by the Supreme Court in one of the older cases:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely *regulates* and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the re-

straint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, *the reason for adopting the particular remedy, the purpose or end sought to be attained,* are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."[8] (Emphasis added.)

In a more recent case the badges, the criteria, by which reasonableness is determined are spelled out:

"In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, *whether the action springs from business requirements* or purpose to monopolize, the probable development of the industry, *consumer demands,* and other characteristics of the market."[9] (Emphasis added.)

These cases recognize that if actions spring from "business requirements" or "consumer demands", they will be upheld although they may result in restraint.[10] These criteria apply with greater force to a business of the character here involved.

 Motion pictures cannot be marketed like other products. The system of clearances whereby protection is granted to exhibitors against competition by re-

8. Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S. Ct. 242, 244, 62 L.Ed. 683. Commenting on this case the Supreme Court, in 1953, stated:
"Certainly even in those areas of economic activity where the play of private forces has been subjected only to the negative prohibitions of the Sherman Law, 15 U.S.C.A. § 1 et seq., this Court has not held that competition *is an absolute.*" F. C. C. v. R. C. A. Communications, Inc., 1953, 346 U.S. 86, 92, 73

S.Ct. 998, 1003, 97 L.Ed. 1470. (Emphasis added.)

9. United States v. Columbia Steel Co., supra Note 5, 334 U.S. at page 527, 68 S.Ct. at page 1124.

10. United States v. Paramount Pictures, supra Note 5, 334 U.S. at pages 156–158, 68 S.Ct. at pages 928–929; Times-Picayune Pub. Co. v. United States, supra Note 5, 345 U.S. at page 615, 73 S.Ct. at page 883.

stricting the area and period in which motion pictures may be exhibited by subsequent exhibitors is legitimate.[11] The Supreme Court has said that clearance

> "is in part designed to protect the value of the license which is granted." [12]

These general considerations are of utmost significance in the case before us. For it cannot be contended that the mere fact that the showing of 16mm films was restricted to certain groups and areas where they did not impinge upon the patronage of the regular theatres was *per se* a violation.

Television stations which telecast motion pictures are both customers and competitors of the producers and exhibitors. For it is shown in the record that some of them are engaged in producing motion pictures for telecasting, thus competing not only with the motion picture exhibitors, but with the motion picture producers for the patronage of the public from whom the viewers of this type of entertainment are recruited. So the problem before us is to determine whether the practice as to either group is *reasonable*.

### III

### Inferences from Similarity of Action

Before doing this, we consider the question to which most of the Government's evidence was directed: Were the practices the result of a conspiracy between the defendants? The courts have laid down rather liberal rules of proof. Express agreement is not necessary. Any *conformance* to an agreed or contemplated pattern of conduct will warrant the inference of conspiracy.[13]

Conscious parallelism of action may be the basis of an inference of pre-existing agreement.[14] However, where *positive* evidence is offered to show the origin of a policy and the business considerations which motivated its establishment, parallelism, conscious or unconscious, ceases to be the determinant. To such a situation the language of the Supreme Court in one of the latest cases applies:

> " * * * To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. * * * But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." [15]

11. United States v. Paramount Pictures, supra Note 5, 334 U.S. at pages 144–145, 68 S.Ct. at pages 922–923; Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 1941, 120 F.2d 891, 894–895; Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 121, 68 S.Ct. 947, 92 L.Ed. 1245; Fanchon & Marco, Inc., v. Paramount Pictures, Inc., 1951, D.C. Cal., 100 F.Supp. 84, 88–89; Id., 9 Cir., 1954, 215 F.2d 167, 170.

12. Schine Chain Theatres v. United States, supra Note 11, 334 U.S. at page 121, 68 S.Ct. at page 953.

13. United States v. Paramount Pictures, Inc., supra Note 5, 334 U.S. at page 142, 68 S.Ct. at page 921; see, United States v. Patten, 1913, 226 U.S. 525, 543–544, 33 S.Ct. 141, 57 L.Ed. 333; Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 1942, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; William Goldman Theatres, Inc. v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738, 744–745; United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 392–394, 68 S.Ct. 525, 92 L.Ed. 746; Milgram v. Loew's Inc., 3 Cir., 1951, 192 F.2d 579, 584.

14. Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490; Lawlor v. Loewe, 1915, 235 U.S. 522, 534, 35 S.Ct. 170, 59 L.Ed. 341; United States v. Masonite Corp., supra Note 13, 316 U.S. at page 275, 62 S.Ct. at page 1076; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575.

15. Theatre Enterprises, Inc., v. Para-

## IV

### The Alleged Conspiracy

Two problems are before us: (a) the existence of a conspiracy as to, and (b) the legality of, certain restrictive practices of the producers as to the exhibition of 16mm films under § 1 of the Sherman Anti-Trust Act.[16]

### A. The Quantum of Proof.

■ Even a motion to dismiss made at the conclusion of the plaintiff's case on the ground "that upon the facts and the law the plaintiff has shown no right to relief", *may now be turned into a decision on the merits.*[17] In acting upon it, the Judge is

"bound to take an unbiased view of all the evidence" [18]

then before him and to accord to it the weight to which he believes it is entitled.

■ In rendering judgment after full trial, we have *greater freedom to choose* between conflicting versions as to facts and between divergent inferences from controverted or even undisputed facts. In making the choice, we are not concerned with theoretical concepts as to burden of proof but are governed only by the preponderance rule. In approaching the matter we consider the nature of the product involved.

### B. The Nature of 16mm Films.

The standard gauge for motion picture films is 35mm. The 16mm films were not originally intended for commercial exploitation. Their use began in 1935, and arose out of demands for home showings and showings before "non-theatrical" audiences. During World War II the major producers, including the defendants, released 16mm versions of their feature films for showing by the Armed Forces, Veterans' Hospitals, the American Red Cross, and the United Services Organization, Inc. (USO), furnishing them free to the Armed Forces. The demand from military and auxiliary organizations diminished at the end of the war, but increased from the civilian market. A majority of all 16mm feature films exhibited in the United States are produced and distributed by the defendants. However, it should be borne in mind that the standard 35mm versions of feature motion pictures are, as one of the former officers of RKO put it, "the life blood" of the motion picture business. By contrast, 16mm films constitute, at most, a minimal percentage of this business.

The actual or potential market for 16 mm feature films includes the following, among others: (a) Armed Forces of the United States, Veterans' Hospitals and various other Government agencies, American Red Cross, and United Service Organizations, Inc. (USO); (b) theatreless towns, hotels, clubs, camps, roadshow men, drive-in theatres, merchants' free shows, coin-operated machines, and private homes; (c) schools, churches, and charitable organizations; (d) hos-

mount Film Distributing Corp., 1954, 346 U.S. 537, 540–541, 74 S.Ct. 257, 259, 98 L.Ed. 273. See, Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 368–371; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 7 Cir., 1950, 182 F.2d 228, 232–233; Dipson Theatres, Inc., v. Buffalo Theatres, Inc., 2 Cir., 1951, 190 F.2d 951. See, Note, Conscious Parallelism—Fact or Fancy, 1951, 3 Stan.L.Rev. 679; Michael Conant, Consciously Parallel Action in Restraint of Trade, 1954, 38 Minn.L.Rev. 797; John Purington Dunn, Conscious Parallelism Re-examined, 1955, 35 Boston U.L.Rev. 225. For a witty comment on the liberal rule of proof in antitrust cases see, Moses Lasky, The Long Bow

Or Lucretius, Book IV, Line 817, 1955, 43 Cal.L.Rev. 596.

16. 15 U.S.C.A. § 1.

17. Rule 41(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

18. Allred v. Sasser, 7 Cir., 1948, 170 F. 2d 233, 235. See, United States v. Borden Co., 1954, 347 U.S. 514, 516–517, 74 S.Ct. 703, 98 L.Ed. 903; Young v. United States, 9 Cir., 1940, 111 F.2d 823, 825; Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 1941, 120 F.2d 891, 892; Bach v. Friden Calculating Mach. Co., 6 Cir., 1945, 148 F.2d 407, 411; Chicago & N. W. Ry. Co. v. Froehling Supply Co., 7 Cir., 1950, 179 F.2d 133, 135.

pitals, sanatoria, homes of the aged or disabled, and convents; (e) ships, trains and planes.

There is testimony in the record that, on the whole, 16mm films are not so suitable for theatrical exhibition as the 35mm films. This for the reason that the larger the gauge of the film, the better the opportunity to achieve clarity in projection. In contrast, when the optical image is reduced from 35mm to 16mm and is blown up on a big screen, there is loss of clarity. Because of this deficiency, no substantial number of theatres exhibiting 16mm motion pictures commercially has ever existed or exists today in the United States. And, at best, commercial distribution of 16mm films is and always has been marginal. There is, however, increasing demand for 16mm feature films for television programming, since a majority of telecasting stations in this country are quipped with facilities for the telecasting of 16mm and not of 35mm films. The following statistical data are illuminating.

The number of stations having 16mm projection equipment only increased from 67 in 1952 to 372 in 1955 (August 5). According to statistical data compiled by a Government economist, and placed into the record, the number of television stations having both 35mm and 16mm equipment actually decreased from 22 in 1952, to 19 in 1955. The percentage distribution for the same period was 20.3 in 1952 for 35mm and 16mm, 62.1 for 16mm, 4.6 in 1955 for 35mm and 16 mm and 95.1 for 16mm.

While this increase in the possibilities for televising 16mm versions of feature motion pictures was taking place, the major producers were experimenting with diverse methods for the enlargement of the vista beyond that provided by the standard 35mm film. To attain this object, a larger gauge was and is being developed ranging from 55mm to 70mm. Reduction from standard to the smaller gauge in order to achieve a wider exploitation of 16mm feature films would be a reversal of this trend in the production of motion pictures.

Against this changing technological and market background, what were the actions of the producers after the war demands ceased?

## C. Independent Action or Concert.

In seeking to satisfy the needs of the market just outlined, the producers were compelled to take into consideration the individual demands and distinct needs of the various exhibition outlets already enumerated. These outlets which we have designated as (a), (b), (c), (d) and (e) can be reclassified into two general groups. The first group ( (a), (c) and (d) ) consists of establishments to which the general public is not admitted and where no admission fee is charged. To those in this category, 16mm films were made easy of access,—the postwar policy being to allow exhibition at low rentals a few months after the release of the standard versions, the lowest period being six months.

To certain persons and institutions in the second group ( (b) and (e) ) some of the producers, at one time or another, denied access to 16mm films altogether. When they were offered to them, the availability period ranged from twelve to eighteen months. Comparative tables and data as to this will be given further on in the discussion. For the present we confine ourselves to a brief summary of the bases for the policy of denial or total exclusion.

In the establishments included in the first group motion pictures are *exhibited* to build morale. The viewers are persons who *would not* patronize commercial motion pictures, because *they could not,* at the time, leave the institutions. For this reason practically no territorial restrictions are applied.

In the establishments in the second category were persons who *sought* diversion and *could* patronize commercial theatres. Because of this, territorial limitations were applied which differed in various areas depending on the assumed hab-

its of theatre-goers,—longer in the Western states where, presumably, persons will travel farther for entertainment. These factors applied also to certain theatrical locations where motion pictures in substandard size were exhibited to the general public for a small admission fee. This included theatreless towns, in which a person would seek permission to exhibit a film at intervals in a private residence, or, as has been testified, on the side of a farmer's barn. As to these, several considerations determined availability: (a) price; (b) the character and responsibility of the person to be entrusted with the film; and (c) proximity of 35mm theatre. In these instances, all other considerations being equal, 16mm films were made available within eighteen months, more or less.

Distance was important in accepting and rejecting locations. But there was no uniformity of policy as to it between the defendants. Several charts indicating the action of other companies on certain rejected locations are reproduced here:

### RKO Radio Pictures, Inc.

Action of Other Companies Prior to July 22, 1952 on 2,107 Locations
Rejected by RKO Radio Pictures, Inc. from 1946 to July 22, 1952

| | Twentieth Century-Fox Film Corporation | Universal Pictures Company, Inc. | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 497 | 209 | 67 |
| Rejected | 48 | 38 | 1 |
| No application | 1,562 | 1,860 | 2,039 |
| Total | 2,107 | 2,107 | 2,107 |

### Twentieth Century-Fox Film Corporation

Action of Other Companies Prior to July 22, 1952 on 2,651 Locations
Rejected by Twentieth Century-Fox Film Corporation from
March 10, 1941 to July 22, 1952

| | RKO Radio Pictures, Inc. | Universal Pictures Company, Inc. | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 168 | 100 | 106 |
| Rejected | 48 | 125 | 9 |
| No application | 2,435 | 2,426 | 2,536 |
| Total | 2,651 | 2,651 | 2,651 |

#### Universal Pictures Company, Inc.

Action of Other Companies Prior to July 22, 1952 on 2,022
Locations Rejected by Universal Pictures Company, Inc.
from 1946 to July 22, 1952

| | RKO Radio Pictures, Inc. | Twentieth Century-Fox Film Corporation | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 273 | 486 | 52 |
| Rejected | 38 | 125 | —— |
| No application | 1,711 | 1,411 | 1,970 |
| Total | 2,022 | 2,022 | 2,022 |

#### Warner Bros. Pictures, Inc.

Action of Other Companies Prior to July 22, 1952 on 30 Locations
Rejected by Warner Bros. Pictures, Inc. from
Aug. 1, 1951 to July 22, 1952

| | RKO Radio Pictures, Inc. | Twentieth Century-Fox Film Corporation | Universal Pictures Company, Inc. |
|---|---|---|---|
| Approved | 2 | 16 | 5 |
| Rejected | 1 | 9 | — |
| No application | 27 | 5 | 25 |
| Total | 30 | 30 | 30 |

These charts indicate independent action by each of the companies involved with reference to these locations,—of the type that *would not* have been taken if there had been preagreed understanding or even intentional conformity.

Indeed, individual distributors did not follow a uniform or consistent policy as to locations,—they accepted locations at certain distances at one time and rejected others of the same distance at other times. So while there is similarity in the pattern, there is enough variation to dispel the idea of concert as the source of the policy. This is especially true when we consider the emphatic testimony of the officers of the producers at the trial that *there was no understanding,* tacit or other, as to the policy. The same officers testified that the failure to release feature motion pictures in the vault to television was the result of their individual determination considering the market, the price, the effect of release on the reissue value of the motion pictures, the effect of television on the personality of the actors, and similar considerations. These were all of the type which are determinative of distribution policy in the case of any commercial product.

In short, the testimony in the record warrants the conclusion that whatever similarity exists in the restrictions adopted as to the exhibition of 16mm films was due to the similarity of the problem with which the producers were confronted. Each of the companies had also to consider the effect of the release of 16mm pictures on the custom of their regular customers, the 35mm theatre exhibitors. For each of the 35mm theatre owners in the field was either a customer

or a prospective customer of each of the producing companies. So the effect of the release upon them had to be borne in mind. If in so doing the producing companies, so far as television is concerned, bided their time, the attitude was commanded by the effect which an unrestricted policy would have upon theatre viewers of motion pictures.[19] In the last analysis, therefore, similarity of problem engendered similarity of action, a phenomenon recognized by lawyers and economists alike, which will be treated further on in the discussion.

### D. The Role of TOA and other exhibitor groups in Television Policy.

The Theatre Owners of America (TOA) is not only named as one of the co-conspirators, but is treated by the Government as the *bête noire* in the case. It has been pictured as the chief instrument for making effective the restrictive policy. While some of the officers of the producing and distributing companies have been in correspondence with the organization, and others may have even kept informed of, or spoken at, some of its meetings, the evidence in the record shows that the organization, instead of being a means for carrying out the producers' policies,—as is often the case,[20] —was constantly complaining that the producers and distributors had failed to adopt a definitive policy of exclusion as to 16mm films. Indeed, in the exhibits offered to show the activities of TOA, both at regional and national level, its relation to the producers seems to be not that of a co-conspirator helping effectuate policies mutually agreed upon, but rather as a gadfly, constantly urging the producers to *adopt a definitive policy.*

One of the Government's exhibits is a letter dated October 7, 1948 sent to all the producers, in which the President of TOA informed them of the resolution adopted at their convention and which stated:

"We would very much appreciate it, if you will, at your earliest convenience, reply to this request from our members and advise us of the position of your Company in this matter."

This letter does not read like the *peremptory* urging or command of a co-conspirator, saying in effect:

"This is the policy adopted to which you must conform."

Rather, does it sound like a humble petition to some one whose actions it *cannot* control that the supplicant be informed of the position the producing company would take. And the producers so understood it. For in answer to the letter the President of Universal stated:

" * * * We will, of course, give due consideration to it in any future decisions by this Company.

"As you know, television is still in its formative stage. We are watching it very carefully, as I am sure everyone in the motion picture industry is doing, and it appears as though it will be some time before any of the companies will be in position to make any determination with respect thereto."

On January 29, 1949 TOA's television committee made a report which had

---

19. The producers were aware of the adverse effect of television on attendance at motion-picture theatres. The investigation conducted by Stanford Research Institute in four typical western towns, the results of which were placed in the record, indicates that of the persons interviewed in what the investigators considered a typical urban area 79.4% consisted what they called the "common audience", i. e., persons who saw motion pictures and looked at television frequently. The investigation disclosed that of this group 22.5% would not attend motion pictures if better quality feature films were shown on television. A companion chart in the record estimated that such a reduction in theatre attendance would have entailed a loss of 67.7 millions of dollars to producers and distributors for the year 1954. This loss contrasts enormously with the amounts available for televising motion pictures in that year,—21.9 million.

20. United States v. Food and Grocery Bureau, D.C.Cal., 1942, 43 F.Supp. 974.

among its recommendations the following:

"a) We recommend that this association go on record as commending heartily those industry leaders in production and distribution who, in the protection of their own business and the business of their exhibitor customers have adopted a sound and long range point of view and have declined to make available to Television, those films which were created for and paid for by the motion picture theatres.

"b) We further recommend that all producing and distributing companies be counselled by this association in the strongest terms that a grave danger and injustice would be presented should Television be provided with motion picture film designed and created for exhibition in motion picture theatres. This recommendation is not made to repress or hamper a new art. It is based on the truth that any such practice would cripple the theatres and diminish the power of the theatres of the country to continue to support the fine productions that the theatre industry has made possible. We feel that the 'giving away' of the industry product on television is economically indefensible from the point of view of the theatres. We believe it to be equally unsound from the point of view of the producers and distributors who would soon find that they have jeopardized their own income as would be evidenced by the diminishing returns at the box office."

One of the most active regional exhibitor groups is Allied Theatres of Illinois, Inc. Its correspondence, through its very vocal President, Jack Kirsch, appears in the record. In a letter addressed to him on May 14, 1951, by Herbert J. Yates, President of the Republic Pictures Corp., as to which a Consent Decree has been entered in this case, it was stated that

"Republic's sole television activity has been to consider the sale of some of our old pictures produced approximately ten or more years ago and which are obsolete for Motion Picture theatres."

Mr. Kirsch's answer showed very emphatically his disapproval which extended not only to an actual inauguration of a policy of distribution but even to its *consideration*:

"In spite of all you say in your letter, we can't see the moral justification of any producing-distributing company even considering making their films available to television regardless of their age. Those pictures which you refer to as being 'obsolete for Motion Picture theatres' were made specifically for theatre consumption and the film rentals from exhibitors which went towards making the production of these pictures possible are now going to be diverted to a use that is absolutely detrimental to those same exhibitors' interests.

"Our organization has consistently taken the position against any company making their film available to television, because by doing so they are breaking faith with their theatre customers. We have restated this position on each occasion when such a move was contemplated or consummated by any distributor. If we did otherwise we would be derelict in our duty and responsibilities to the hundreds of independent theatre owners whom we represent and who rely on us for guidance and assistance.

"We must therefore take the same position in voicing our serious objections to your considering the sale to television of pictures regardless of their age or quality. If the sale to television of pictures ten years old went unchallenged there would be no end to this practice.

"I am sorry, Mr. Yates, that we must of necessity disagree with the reasons which you set forth as motivating your decisions, but we shall continue to cling to the hope that on

reflection and in the best interests of the future welfare of our great industry you will reconsider your action."

In forwarding the correspondence to the General Counsel of Allied States Association of Motion Picture Exhibitors (Allied) one of the exhibitor associations named as co-conspirators in this action, Mr. Kirsch made this notation:

"To my mind we shouldn't relax our objections to any distributor who might be thinking along similar lines. First it will be pictures 10 years old, then 5 and the next thing we know they'll be selling TV right out of the can."

On February 25, 1952 a progress report of TOA, signed by all three of its national chairmen, still considered the policy *unsettled* so far as the major producers were concerned. It stated:

"Sale of Films to Television

"Wants Issue Settled

"Walter Reade, Jr., urged that President Mitchell Wolfson be authorized to name a committee, representing the West Coast, Chicago, and New York areas, to call upon the heads of each company *to settle once and for all* the position of that company with regard to the sale of films to television.

"Committee Appointed

"Wolfson appointed the following exhibitor-leaders to serve as a committee to approach producers and let them know that *'we are fully opposed to their selling film to television:'*

"Walter Reade, Jr.,
 Eastern Chairman.
"Sherrill Corwin,
 Western Chairman.
"Eddie Silverman,
 Chicago Chairman."

On March 6, 1952, at a meeting of the Independent Theatres Association, its President, Harry Brandt, according to a Government exhibit, spoke:

"in some detail about the exhibition of theatrical films on commercial television stations and *castigated* the practice as detrimental to the industry."

These instances show that: (a) there was no uniform policy as to television; (b) the theatre owners' associations, although alleged to be *co-conspirators*, had evidently not been instrumental in securing the adoption of such uniform policy; (c) some of the producers were considering the sale of or actually selling feature pictures for television; and (d) that in so doing they *were not consulting* other producers or the theatre group, which was constantly clamoring for, but evidently not receiving, the assurance of a uniform practice. So the activities of these trade associations, expressive as they may be of the wishes of the exhibitors, fail to show transmutation into action or even promise of action by the producers.

On the whole, we are led to the conclusion that while the restrictive practices of which the Government complains were, in the main, actually practiced by the defendants, they were determined upon individually by the producer-defendants and were not the result of concert or conspiracy between the producer-defendants and/or any of the other co-conspirators named or unnamed.

In what precedes we have outlined with brevity the basis for this conclusion. Additional facts will be adverted to as we discuss the problem of reasonableness. For as I insisted throughout the trial, two problems are before the Court: (a) the existence of a conspiracy to restrain commerce through certain restrictive practices; and (b) the reasonableness of the practices. The two problems are interrelated. Of necessity the facts relating to them overlap. And an attempt, in an opinion, to separate too rigidly the facts as they relate to one or the other of the problems would result in unnecessary length and repetitive treatment.

V

The Problem of Reasonableness

The reasonableness of the restrictive practices shown to exist is a cardinal issue in this case and was adverted to

in what precedes. Some of the principles, such as uniformity of conditions for which only one remedy exists, were also alluded to. However, they and others require a greater elaboration.

### A. Identity of Problem and Remedy.

Courts and writers have for a long time taken cognizance of the fact that in our modern economy the units which compose a particular activity, no matter how independent they may be, are, to a great extent, interrelated. The problems which arise are of a character which affect all, and when this is the case uniformity in the solution of the problem may result

> "from active, free and unrestrained competition."[21]

Economists have noted the occurrence of this fact in cases where the number of sellers of the product is small and the group of buyers is large. In these instances, especially if the product has become standardized,

> "all buyers and sellers are in full communication with each other, so as to constitute really one market." [22]

The act of each, no matter how independently taken, may have a striking similarity, for the very obvious reason that the measures taken are *the only ones* which commend themselves in the circumstances. As the same writer has put it:

> *"Each is forced by the situation itself to take into account the policy of his rival in determining his own, and this cannot be construed as a 'tacit agreement' between the two.*

"This is true, no matter how complex the manner in which his competitor's policies figure in the determination of his own. A certain move, say a price cut, may be advantageous to one seller in view of his rival's *present* policy, i. e., assuming it not to change. But if his rival is certain to make a counter move, there is no reason to assume that he will not; and for the first seller to recognize the fact that his rival's policy is not a datum, but is determined in part by his own, cannot be construed as a negation of independence. It is simple to consider the indirect consequences of his own acts—the effect on himself of his own policy, mediated by that of his competitor. Of course, he may or may not take them into account, but he is equally independent in either case." [23] (Emphasis added.)

So when we are dealing with *free* entertainment, whether by permitting distribution of 16mm films to non-paying, non-theatrical audiences or theatreless towns, or with television, which is essentially an advertising method, in which entertainment is used as a channel for selling a product,—the problem confronting the producers of motion pictures is that of retaining the customers who come from a common audience.

Just as in the case of clearances and runs, the problem is to make such *territorial* and *time* restrictions upon the availability of the product as will protect the value of the license granted to the exhibitor.[24] In both instances the fac-

**21.** Cement Manufacturers Protective Ass'n v. United States, 1925, 268 U.S. 588, 605, 45 S.Ct. 586, 592, 69 L.Ed. 1104. See, Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 368–369.

**22.** Edward H. Chamberlin, The Theory of Monopolistic Competition, 6th ed., 1950, p. 31. See also, pp. 47, 106.

**23.** Chamberlin, op. cit., p. 31.

**24.** Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 121, 68 S.Ct. 947, 954, 92 L.Ed. 1245. The Court in that case quotes with approval the following statement from Bertrand, Evans & Blanchard, The Motion Picture Industry,—A Pattern of Control, 40–41 (TNEC Monograph No. 43, 1941) :

" 'The establishment of clearance schedules is an intricate procedure. It involves a complex bargaining process and *the balance of a variety of opposing economic interests.* It may be stated initially that the primary objective of the distributor is, of course, *to maximize his total revenue from each picture.* This aim gives him a very direct inter-

tors which bear on reasonableness are numerous and involve the accommodation of a variety of apparently conflicting economic interests.[25]

No refusal to sell a product to customers *similarly situated* is involved. At most, there is restriction in the sale of *competitive* 16mm films which may reduce the custom of theatres for which motion pictures in standard size are primarily made. For as non-theatrical groups and television audiences may draw from the common pool of diversion-seekers, the restrictions protect the producers' main source of income. This protection may produce some assymetry, but this is inevitable in any classification.

### B. Some Business Consideration.

Certain fundamental facts require assertion. The Producer-defendants cannot be compelled by decree of court to *make* 16mm versions of any of their productions. Two of the major producing companies, Metro-Goldwyn-Mayer and Paramount, were not made parties to this action because they do not produce films of that dimension. We assume that as the backlog of old pictures and the copyrights to them are the private property of the producers, they could, if they so desired, entirely destroy the master negatives after a film has had its run. If this were done, no subse-

quent exploitation would be possible. And a Government which has sanctioned and compensated for curtailment or even destruction of food products could not complain of the use of similar methods for preventing a possible "glutting" of the film market.

The accessibility of 16mm films to distribution could *not be* absolute or unrestricted. At the argument, the Government conceded that a minimum time for full exploitation of motion pictures in 35mm films *would have to be allowed* before the 16mm versions *were ordered* marketed. The Government is, likewise, powerless *to fix* the prices for the exhibition of 16mm films. However, a court could decree (as was done in the consent decree here) that they should be obtainable at a *reasonable price*, because this is a norm valid in law, flexible and capable of exact ascertainment.[26]

So the problem, in the last analysis, is one of *degree*. The evidence shows that the policy of each of the producer-defendants as to 16mm films *has not been static*. On the contrary, it has been and still is *fluid*. This is especially true as to their attitude towards releasing 16mm feature films for telecasting. Granted that at the inception of television there may have been a policy of opposition to the use of 16mm films, there has been a gradual deviation from this rigid atti-

est in clearance periods. The higher rental fees paid by the prior-run exhibitor are directly conditioned on the extent of the protection which he is granted, and in general the longer the clearance period before subsequent showing, the higher the rental fee the prior-run exhibitor will pay.

" 'On the other hand, the distributor's revenue *from subsequent-run exhibition is also important to him; this income may mean the difference between black or red ink on his ledgers.* But the longer the clearance period, the smaller will be these returns—not only because more customers will have attended the prior showing rather than wait for subsequent exhibition, but also because the effects of the advertising and exploitation efforts made when the picture was released will have been vitiated over this time. In general, the greater the total

box-office return earned by a film in all showings, the greater will be the distributor's revenue. * * *

" 'The relation between run, clearance and zoning, admission price, seating capacity, and rental fees is indeed a complex one. The range covered by these factors is indicated by this fact: a license fee amounting to many thousands of dollars may be paid for the first showing of a film in a large metropolitan theater, and within a year the same film may be exhibited in some small theater in the same city for a fee of less than $20.' "

25. Schine Chain Theatres v. United States, supra Note 24.

26. See the writer's opinion in F. & A. Ice Cream Co. v. Arden Farms Co., D.C. Cal.1951, 98 F.Supp. 180, 184–188.

tude. The record, in the case discloses the willingness of each of the producing defendants to consider proposals for use of feature films in television if the terms, including price, are reasonable and acceptable. Specific facts will appear further on in the discussion.

A Government witness, General David Sarnoff, Chairman of the Board of Radio Corporation of America, which owns the National Broadcasting Company, very frankly summed up the difficulties engendered by the development of television and the need for material for its programs in a deposition offered by the Government. After referring to discussions had over the years with some motion picture producers about releasing pictures for general use in television, General Sarnoff stated:

"I had not supposed that a major motion picture company, making a feature film for distribution to theatres, could be expected to make that film available to a television station because of the economics of the situation in television to pay for a new feature film which might cost millions of dollars.

"I had a different feeling with respect to feature films already in the vaults and which were not being distributed to theatres.

"I want to make that distinction because I don't want to leave a false impression that I am publicly complaining against the motion picture industry for not making their new feature film available to television. I am making no such complaint. I am not complaining as to their pictures in their vaults, either. I am merely suggesting that I thought they were missing a good bet in their refusal to make those pictures available, and I thought that television was missing the opportunity to make those pictures available to the viewing public.

"I have understood and appreciated the fact that the motion picture producers have theaters to serve;

they are their large and major customers, and that these motion picture theaters looked askance upon the motion picture producers making any of their pictures, old or new, available to this new arrival, television.

"So, when you take these factors into consideration in toto and strike a balance, I am not prepared to say that so far as the motion picture producers are concerned that their decision or their practice, or their wish, not to make the product of their vaults available to television, was necessarily false economics from their standpoint.

"They know their business better than I do, and therefore, if they felt that they shouldn't make them available on economic grounds, that was their business.

"Now, television has survived and it is thriving despite that, and as you know, in recent months, there has been a perceptible change of attitude on the part of some motion picture producers, and pictures are, in some instances, now being made available to television stations and networks. Not feature pictures, but shorter pictures, and pictures that these producers are making specifically for television.

"In fact, there is a rush to get on the wagon right now."

This witness, representing a competitor of both the producers and the exhibitors in the field of entertainment, while critical of the attitude of the motion picture producers, nevertheless saw *a business* justification for their practice. One fact is significant in his deposition. He saw, as did the various witnesses of the producers who testified in the case, the problem of price. And while he applied it only to current features, the testimony of others makes it evident that the problem exists so far as the so-called "vault" is concerned, that is, feature pictures which are on the shelves of the producers.

There is ample testimony in the record that the prices offered were minimal to start with but have been on the rise constantly. The time element is important, both from the standpoint of the price that may be secured, its effect on the general demand for motion pictures for theatrical purposes, and the possibility of reissue or remaking.

It may well be, as General Sarnoff said, that in some instances, the value of the backlog may diminish and that if colored television becomes the rule, black and white features may not be in great demand. But, in the last analysis, these facts must be borne in mind: Television is a new medium. Motion pictures antedated it by many decades. The motion pictures are produced primarily for theatrical exhibition. The theatre-goers are and have been the main source of the motion picture industry's custom. The motion picture or the public at large could not anticipate the rapid development which television has achieved. Reduction in price in less than a decade has brought television sets of excellent performance within the reach of everyone. Granted that the motion picture industry must anticipate and supply demand and that the practice of some restriction towards new demands may contravene the antitrust laws, the fact remains that in the matter of distribution, with which we are concerned here, to warrant the condemnation of restrictions as detrimental to the free flow of commerce which the antitrust laws are intended to protect, the situations to which the practices relate must be comparable. This is the test by which the legality of classification is judged generally and which has been applied to motion pictures.[27]

All cases justify the staggering of releases and reasonable differentiation as to runs between theatres depending on location, customers, price and the competitive position towards one another.

Availability is, in a sense, a form of "staggered" distribution. Clearances and runs stagger distribution by agreement with distributors; availability is a unilateral policy established by the producers through which films are made available *generally* after a certain definite period, which, in the case of RKO, was six months, and in the case of Fox and Warner, one year. Universal had no definite time policy. It evolved a pragmatic system in which the time element for availability conformed to no specific formula. It merely expressed the practice evolved by the men in charge of their 16mm distribution.

After 1951 Warner distributed 16mm films through Films, Inc. While the time limitations were similar to those of other companies, they were *not identical* in all respects. And the evidence in the record shows that they were determined by the similarity of the problems involved. At times the longer periods were dictated by the factor of cost, despite the fact that they related to nontheatrical showings such as schools. The charge for showing was so insignificant that it was decided to use over and over again a small number of prints rather than print additional ones. In all, the injurious effect of the showing on *the income* to the producers from theatres was one of the considerations. Its validity as an economic reality cannot be impaired by calling it, as some of the agents of the producers did in correspondence, "a protection" from unfair competition. For, as already appears (II and V–A), such aim does not violate the antitrust laws. But while in the case of theatres the effect of other showings on revenues is *only one* of the elements to be considered, this element becomes *all important* when we are dealing with a medium like television which competes not only with a particular theatre, but with the whole

field. For *any* exhibition of 16mm films *anywhere* competes with the theatre.

The rapid development of television competition was not anticipated; and an industry is not expected to have prescience. More, it is not required to sacrifice its *established custom* in order to supply a late-comer in the field who is also a competitor. This is especially true when its production has been geared to the old customer, the motion picture theatre, for whom the production has been historically made, and distribution through whom *is* and *has always been* the main means for reimbursement of the cost of the product.

### C. Reissues.

One of the considerations governing the restrictive policy as to television is the loss of the value of motion picture reissues. An increasing practice in the industry in recent years has been to take a picture which had been in the vault for some time after a complete run and reissue it for the benefit of those who had not seen it. Witnesses for the defendants have testified that aside from the question of price, a rapid distribution of old pictures through television, even at an acceptable price, would destroy their value for reissuing and remaking purposes. Indicative of the revenue which lies in reissue is the fact that from June 1947 to early in 1955 Realart, which distributed reissues for Universal received as film rentals for feature films the sum of $20,835,218.17. Of this amount, Universal received as its net proceeds the sum of $6,816,429.84. A chart introduced on behalf of the defendant RKO indicates that the revenue from reissues is not only substantial, but that in some instances, it exceeds the income from the original. The following data culled from one of the exhibits show the income of RKO from reissues as contrasted with the income from the original distribution and the very minimal income from 16mm distribution:

| Title | 16mm Grosses | U. S. Gross Film Income Not Including Reissue | U. S. Gross Film Income from Reissue |
|---|---|---|---|
| The Lost Patrol | | 327,286.30 | 257,559.97 |
| Last Days of Pompeii | 2,986.00 | 469,890.25 | 298.415.93 |
| Snow White | 7,492.00 | 3,739,095.74 | 3,070,250.34 |
| Alleghany Uprising | 12,931.00 | 641,560.81 | 30,885.92 |
| Hunchback of Notre Dame | 9,528.00 | 1,416,406.20 | 133,964.26 |
| Dumbo | 14,296.00 | 957,919.16 | 251,222.62 |
| Tarzan Triumphs | 95.00 | 847,832.78 | 224,392.73 |
| Lady Takes a Chance | 9,478.00 | 2,039,344.51 | 156,827.42 |
| Tarzan's Desert Mystery | 95.00 | 860,229.61 | 213,038.51 |
| Tall In The Saddle | 10,377.00 | 1,470,262.58 | 279,469.57 |
| Tarzan and the Amazons | 58.00 | 979,540.55 | 156,469.19 |
| Sunset Pass | 7,315.00 | 253,150.57 | 27,833.37 |
| Bachelor and the Bobby Soxer | 25,591.00 | 4,012,097.93 | 1,420.24 |
| King Kong | 1,569.00 | 710,653.08 | 1,607,999.93 |
| Gunga Din | 10,090.00 | 1,433,397.16 | 455,507.51 |
| Bombardier | 2,849.00 | 1,653,846.32 | 161,019.39 |
| Mr. Lucky | 5,446.00 | 2,536,426.64 | 137,645.90 |
| Saludos Amigos | 7,054.00 | 488,000.58 | 189,031.47 |
| Marine Raiders | 3,061.00 | 1,300,701.17 | 210,634.48 |
| Back to Bataan | 3,595.00 | 1,733,631.07 | 242,974.25 |
| Bringing Up Baby | 12,288.00 | 687,662.82 | 91,931.44 |
| Vivacious Lady | 7,456.00 | 799,133.15 | 192,786.21 |
| Too Many Girls | 5,899.00 | 440,375.00 | 16,903.32 |
| Look Who's Laughing | 7,202.00 | 1,117,455.35 | 16,713.14 |

This led several of the witnesses for the defendants, among them Ned Depinet, a former president of RKO, and Jack L. Warner, in charge of production for Warner, to state that it is really *impossible* to fix a definite time beyond which a motion picture has no reissue value. The appeal of some of the pictures is perennial. Each new generation of children would wish to see *Snow White, Bambi, Dumbo, Pinocchio, Wizard of Oz, Cinderella* and others, just as different generations of adults may wish to see the jungle adventures of *Tarzan* and other adventure and action pictures.

Pictures with Indian and frontier background and the typical "western" depicting the hardships of the pioneer have a constant appeal to both young and old, because the western pioneering spirit has played so important a part in the development of our country.

The motion picture as a popular art is especially adapted to help the masses, in these days of "mass culture", identify themselves with the characters of the pictures, give them a sense of belonging and to aid them to relive *vicariously* a past which disappeared long ago.

The experience with reissues stands as proof of this fact. However, the destruction of the reissue value would entail other losses. It would affect adversely the value of the pictures for remaking purposes and would also force the motion picture producers to acquire other stories to replace the stories used in the old feature films. Remade films constitute a substantial percentage of the production of the five producing defendants, as is indicated by the following chart:

Comparison of Original and Remade Feature Film
Productions to Total Feature Film Issues
Five Companies
1946–1954

| Year | Issues | | | | | Remade Features as Percent of Production | Remade Features as Percent of Issues |
|------|--------|---|---|---|---|------|------|
| | Company Produced | | | Produced by Others | Total Issues | | |
| | Original | Remade | Total | | | | |
| 1946 | 142 | 18 | 160 | 22 | 182 | 11.3 | 9.9 |
| 1947 | 120 | 9 | 129 | 25 | 154 | 7.0 | 5.8 |
| 1948 | 117 | 6 | 123 | 52 | 175 | 4.9 | 3.4 |
| 1949 | 138 | 8 | 146 | 31 | 173 | 5.5 | 4.6 |
| 1950 | 146 | 6 | 152 | 33 | 185 | 3.9 | 3.2 |
| 1951 | 162 | 10 | 172 | 31 | 203 | 5.8 | 4.9 |
| 1952 | 145 | 6 | 151 | 31 | 182 | 4.0 | 3.3 |
| 1953 | 116 | 16 | 132 | 23 | 155 | 12.1 | 10.3 |
| 1954 | 101 | 8 | 109 | 35 | 144 | 7.3 | 5.6 |

The money value of the reissues is an important factor, as appears from the substantial income derived from the contract already referred to between Universal and Realart, relating to the reissue of a group of old pictures produced between 1933 and 1946. On a recent remake of "Magnificent Obsession" which, when originally issued in 1934, gave only a fair return, Universal has grossed over $5,000,000 to date from *domestic* distribution alone. The phenomenal success of a recent picture dealing with juvenile delinquency, "Blackboard Jungle", by one of the producer-defendants led to a revival by Universal of an old picture, "City Across The River", dealing with the same subject which is meeting with greater success than the original exploitation. Teamed with another picture on the same subject it has grossed in excess of $150,000 in ten or twelve weeks of exhibition in theatres.

The value of the stories from which the pictures are made was stressed in the testimony of Jack L. Warner, Vice-President of Warner, in charge of the production of films, and others, who stated that in the light of present market conditions some of the stories from which old pictures were made and to which the producers have absolute right have a value as high as $500,000. This would be an important item of cost saved should the company decide to remake a picture or to produce a musical version of it as was done successfully by Warner and others with similar properties.

The release of the old version of the picture to television would result in the loss to the producer of this residual value also. In the light of this it can be well understood why producers like Warner and others are of the view that no arbitrary time limit can be established at which the residual value becomes minimal or has been wholly dissipated. Nor is it possible to choose between pictures with any accuracy. To the question "Is it possible for you now to tell which of your older films have remake values and which do not?" Warner answered:

"Well, I could—most everyone of them have, according to the time, the tenor of the public, the susceptibility of the people. It is a showmanship feeling whether you can or cannot remake a story.

"For example, I will give you the name of a story, Saratoga Trunk by Edna Ferber. We made that into a film that was highly successful. We have the right to make that picture as a musical version. That has been done time and time again where you use a book or a play and you make it first as a dramatic or comedy film, and then one, two, three, four, five years, ten years, sometimes 15 years later you may make it as a musical version, which is a common practice in the theatre, as well as in film. Therefore, you have a ready property in a manuscript form which would probably sometimes cost you two, three, four hundred thousand dollars, in the market of today as high as a million, to buy the proper story or a play. And, again, there is a big percentage that they receive today now. In addition, a man with a good book or play, there isn't any limit to what he can get. We have just been through it with pictures like Mr. Roberts, and many, many more, I won't go into them now, where we give tremendous percentages to the authors and the producers of the stage plays and the novels.

*"If we would get rid of this film at a very early date, we would find that we couldn't use that again, because the complete value would be lost. I feel I am speaking from experience and the tenor of the public."*

Significant also are his answers to two succeeding questions:

"Q. Do you feel that the showing of a film of that kind on television would make it unsuitable for remake? A. It wouldn't make it unsuitable, but *it would lose its complete commercial value, or a great degree of it, which wouldn't make it worthwhile for us to remake it, I don't think.*

"Q. What about re-issues? A. About the same problem, the same thing. There isn't any reason for us, if we did sell a feature of some kind, whether important or not to important, to television—you can imagine if you had to remake that again and advertise to the public it is coming back to X theatre, *I don't think you would get very much of an audience.*"

So while the range of prices now being paid by television for feature pictures may be approaching the average income for reissues, the loss of the stories for remaking purposes, and the need for their replacement by new stories to be acted in by the same or other actors, *are not* compensable by the income from the televising of features. Statistical data in the record confirm this. On the whole, the reissue value is, as one witness stated, "unpredictable".

Some of the data bearing on the subject were compiled only recently. However, the oral testimony referred to and that of others in the record indicates that while each of the producing companies may not have had the benefit of the computation as to the others, and, in some instances, the benefit of its own exact computation, they were fully cognizant of *the facts* as they affected the industry,—such as (a) the value of reissues, (b) the destruction of the stories and of the motion picture personalities, and others,—and that the problems which they created were constantly before them. The more exact statistical data lend strength to their reaction to the business and economic factors which the distribution of 16mm pictures entailed. And, in all cases of this character, justification may be found in economic *facts* if they were apprehended by the industry, even though not reduced to mathematical or statistical form.

Another compelling consideration is the fact that writers, actors and musicians, either personally or through their unions, are making demands for additional payments from revenues derived from television exhibition of motion pictures. As early as March 16, 1948, Screen Actors' Guild gave notice to all the motion picture producers that no motion picture produced after that date could be exhibited on television without additional compensation to the actors. The notice stated:

"Screen Actors' Guild, Inc., takes the position that no producer has the legal right to sell or use for television any motion picture film made for theatre exhibition.

"In our continuing negotiations this will be an important subject. We feel it only fair that you should know that the Guild will take the position in such negotiations that film made for motion picture theatre exhibition may not be used for television without compensation to the actors, to be agreed upon between us as part of a collective bargaining agreement."

The Screen Writers' and Screen Directors' Guilds have taken a similar attitude. Provisions recognizing the right to seek additional compensation have been inserted into subsequent contracts.

The Musicians' Union sought recognition of their right to compensation retroactively for *all* television showings of any motion pictures *regardless of age*. There was testimony that the defendants considered the demands onerous. Each has tried to deal with the problem in its own way. Columbia decided to remake some pictures for television with other artists. RKO considered and finally made a sale in bulk in which a definite sum could be agreed upon as compensation to guild members for television purposes.[28] As to others, the problem is

28. That these demands present difficult problems and are not fanciful is evidenced by the decided cases in the courts of this Circuit dealing with the varied problems arising from television exploitation of motion pictures. See, Wexley v. KTTV, Inc., D.C.Cal., 1952, 108 F.Supp. 558, affirmed in Wexley v. KTTV, Inc., 9 Cir., 1955, 220 F.2d 438; Autry v. Republic Productions, Inc., D.C.

still open, to be determined finally whenever their feature films are released to television.

D. *Decline in Number of Theatres and Attendance.*

The matters just adverted to and their impact upon the thinking of the producers must be equated with another factor which appears in the record, i. e., the actual decline, both in the number of motion picture theatres and the attendance in them.

There was testimony on the part of the defendants that thousands of motion picture theatres closed in the postwar years, from 1945 to 1954, and that many of the remaining were operating part time only. A Government exhibit confirming this fact was introduced in evidence on rebuttal and is here reproduced:

**Number of Motion Picture Theaters in the United States as of the End of Each Year 1945 Through 1954**

| Year | Four Wall Theaters | Drive-Ins | Total Theaters |
|------|------|------|------|
| 1954 | 15,039 | 4,062 | 19,101 |
| 1953 | 14,174 | 3,791 | 17,965 |
| 1952 | 15,347 | 3,276 | 18,623 |
| 1951 | 16,150 | 2,830 | 18,980 |
| 1950 | 16,904 | 2,202 | 19,106 |
| 1949 | 17,367 | 1,203 | 18,570 |
| 1948 | 17,575 | 820 | 18,395 |
| 1947 | 18,059 | 548 | 18,607 |
| 1946 | 18,719 | 300 | 19,019 |
| 1945 | 20,355 | 102 | 20,457 |

There was also placed in the record a compilation showing the decline in motion picture admissions as contrasted with the comparative increase of television sets in use from 1946 to 1954:

**Comparison of Changes in Weekly Motion Picture Attendance and Number of Television Sets-in-Use by Two Year Intervals, 1946 Through 1954 (all data are in millions)**

| Years | Weekly Motion Picture Admissions [1] | Sets-in-Use [2] |
|------|------|------|
| 1946–1948 | −12.5 | + 0.2 |
| 1958–1950 | − 6.2 | + 3.8 |
| 1950–1952 | − 6.1 | +11.8 |
| 1952–1954 | − 6.1 | +12.0 |

On the basis of these tables it was argued that the mortality in what are denominated "four-wall" theatres was compensated by the increase in drive-in theatres during the period. In view of the known increase in the population of

Cal., 1952, 104 F.Supp. 918, affirmed in Autry v. Republic Productions, Inc., 9 Cir., 1954, 213 F.2d 667; United Artists Corporation v. Strand Productions, 9 Cir., 1954, 216 F.2d 305. See, Herbert T. Silverberg, 1952, Televising Old Films —Some New Legal Questions About Performers' and Proprietors' Rights, 38 Va.L.Rev. 615.

1. Compiled from Defendants' Exhibits AW and AX.

2. Compiled from Defendants' Exhibit AJ.

the United States during the period the rise in the number of drive-in theatres cannot be treated as compensatory. Even if the number of new drive-ins equaled the theatres closed, and the admitted fact that some of the theatres were operating part of the time only, were disregarded, we would still have a case of stagnation instead of growth. Of course, the number of theatres might remain constant although the theatre attendance might increase. But the table just reproduced discloses that there has been a decline in theatre attendance during the same period. This decline was at its height in the years 1946–1948. It reached −6.2 millions in 1948–1950 and has continued at about that rate to the present time. By contrast, increase in television sets was greatest during the years of stabilization of the decline in attendance.

It cannot be disputed that the decline which reached its apex in 1946–1948 has continued at a lower pattern to the present time, and is substantial. The producers and others who testified for them have related it to the rise of television. Giving full scope to the views of the Government witness who compiled and testified to the charts relating to the decline, the most favorable inference that can be drawn is that the highest decline having taken place before the full development of television and having decreased during the years of television's greatest growth, other causes than television may be responsible for the distress of the motion picture theatres and the fall in attendance. The significant fact, however, is not so much the curve of the decline but that (a) it existed and still exists, (b) that it is substantial, (c) that it affected the income of the producers, and (d) that the producers believed that it intensified the problems created by television.

In the circumstances, whether television *was* or *was not* the sole or even the primary cause for the condition is not our main concern. At the least it aggravated a non-desirable business situation. As such it was a factor of the type which, as already appears (V–A), the courts have recognized as warranting restrictive practices to protect income.

## VI
### Watchful Waiting

In what precedes we have stated the various business requirements, economic considerations, characteristics of the market and other factors which motivated the individual defendants in establishing the restrictions on the distribution of 16mm films.

### A. Hesitation to Deal.

The time and territorial limitations on distribution of 16mm films to theatrical and non-theatrical distributors were warranted by the economic realities of the situation involved. As said by the Court of Appeals for the Ninth Circuit:

"The regulation of distribution was required by the nature of the product and by the economic and social forces prevailing in the particular area." [29]

As to television the policy of the producer-defendants was one of "watchful waiting". Representatives of several television concerns testified that feature films were not generally obtainable. Much of this testimony was based on hearsay impressions as to the producers' policy. One Government witness admitted that he had *not tried* to obtain films from any of the major companies "because the general impression in the entire field is that it would be a useless thing to do."

In contrast, there is testimony on behalf of the producers (*to be detailed fur-*

29. Fanchon & Marco, Inc., v. Paramount Pictures, Inc., 9 Cir., 1954, 215 F.2d 167, 170. See, United States v. Columbia Steel Co., 1948, 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533; Gary Theatre Co. v. Columbia Pictures, 7 Cir., 1941, 120 F.2d 891, 894–895; Chorak v. RKO Radio Pictures, Inc., 9 Cir., 1952, 196 F. 2d 225, 228–229.

*ther on in the discussion*) that no offer at what they considered a "reasonably acceptable" price was ever made and refused. Even Government witnesses admitted that some negotiations broke down because of disagreement as to price. One engaged in a private business may decline to offer to trade or to trade altogether.[30]

The Clayton Act recognizes the right to select one's "own customers in bona fide transactions".[31] The defendants exercised such choice as to 16mm customers, in order to protect their income from established customers. As said by the Court of Appeals for the Fourth Circuit:

"It seems to this Court quite natural that the distributors would not be prone to substitute an unknown customer for a proven one. This Court cannot see how the preference of one exhibitor over another is, *per se*, a combination in restraint of trade. Indeed, every 'exclusive' contract has that effect." [32]

Up to the date of the filing of the complaint in this case, July 22, 1952, and since, the producer-defendants have taken the view that the promulgation of the *definitive* policy should await the fuller development of television and the rise in prices being paid for feature pictures, as contrasted with those paid for theatrical exhibitions.

On June 27, 1950 the sales manager of Columbia wrote to its President:

"Harry, in closing, my thinking in this matter is that if we decide we want to release film for television— such film on which we have the rights to release—we can do it much better for a much better price at a later date than we can now. More television stations are being continuously built, and the more television

stations that are built the bigger your market becomes for any given picture or pictures, that is obvious.

"Commander McDonald claims there will never be enough film to fill the needs of television. He goes even further and claims that the television need for the future will be greater for film than the need of theatres. Of course, that is his thinking, but I can understand when one realizes all the hours that these stations are on the air how much film they can actually use up.

"I would think, and I believe it is the general thinking of all of us here, that our inventory becomes more valuable as far as television is concerned instead of less valuable, but I repeat that it all bears watching and continuous thinking as to when and how, and at the same time give reasonable protection to the theatres which are the main source of our income and I believe will be for many years."

The same letter stresses the reissue value:

"As far as serials are concerned, Harry, in my opinion it would be foolish for us to release serials for television purposes because we have just *reissued* a serial to the theatres, Wild Bill Hicock, which will gross for us in the United States something between $250/300,000, and that is much more money than we can get at this time for five or six serials being sold for direct use on television."

In a letter dated July 18, 1950 occasioned by the sale of a group of serials by Universal, the same writer, Abe Montague, stated:

"We believe if we can get $12,500 for the negative and film of serials

---

30. United States v. Colgate & Co., 1919, 250 U.S. 300, 307–308, 39 S.Ct. 465, 63 L.Ed. 992; see, Chicago Seating Co. v. S. Karpen & Bros., 7 Cir., 1949, 177 F. 2d 863, 866–867; Windsor Theatre Co. v. Walbrook Amusement Co., 4 Cir., 1951, 189 F.2d 797, 798–799; Naifeh v.

Ronson Art Metal Works, Inc., 10 Cir., 1954, 218 F.2d 202, 206–207.

31. 15 U.S.C.A. § 13(a).

32. Windsor Theatre Co. v. Walbrook Amusement Co., supra. Note: 30, 189 F. 2d at pages 798–799.

for which our rights have expired, that at a later date when there are more television stations operating and more television sets in the homes in America we should be able to get a much better price. I feel you will agree that this seems logical and unless the Government puts on certain restrictions on material that is used in the development of television, there must be a greater number of television stations operating in the near future and, of course, a vast number of more homes that will have television sets."

On August 7 and 8, 1951, at a meeting in Chicago of the officers and officials of Columbia, the impact of television on the motion picture industry was made one of the chief topics of discussion. The conclusion finally reached was that (a) the low price then obtainable for televising motion pictures, (b) the demands of the craft organizations,—the Actors' Guild, The Directors' Guild, the American Federation of Musicians and IATSE and other unions,—for additional compensation, and (c) the company's direct production and exhibition of motion pictures for television, required the continuance of the policy of "watchful waiting" as to the backlog. This meant, as one of the witnesses put it, that it was deemed to be the best business policy to reserve the library for future use, because of the conviction that the greater earning potential lay in the future. Subsequent events confirmed the correctness of the view, as the data already given as to profits from reissues indicate clearly (V–C). At the time (1951) others shared the view that production for theatres was the sole profitable exploitation in sight. B. B. Kahane, a Columbia executive, reported to the meeting just referred to:

"Despite the fact that TV has seriously affected our business and as it grows and develops may affect us more and more, it would seem that for the present and the unforeseeable future, making pictures for theatres and not for TV *offers the only opportunity* for profit. * * *

"Every possible avenue and means must be explored and we must move as rapidly as we can but always bearing in mind that for the present *our business is producing and selling pictures for the theatres.*"

A resume of the proceedings at the meeting indicates that these and other considerations resulted in the determination to leave the problem of distribution to television of the diminutive versions *fluid,* as it had been in the past:

"2. Release of Columbia productions to television—Mr. Cohn and Mr. Silverberg read memoranda from Samuels and Tatum on this subject which was supplemented by a report by Abe Montague and some additional information by myself. In addition, an analysis of the potential television value of Columbia product made by Mr. B. B. Kahane was also read, the sum total of which was that the value of this product in the television market might be as much as $65,000,000. This estimate was slightly higher than some of our own and the pros and cons of releasing pictures to television were discussed. Point was made that with regard to the better Columbia product, *the residual value in this product was worth more today from the theatre market than the television market, and that by reissuing these pictures to theatres we ran into no danger of destroying exhibition.*

"With regard to some of the cheap, old pictures, particularly the westerns, it was stated that here too the reissue value of these pictures was considerable and that as soon as Columbia stopped making series westerns, we could live for a long time on the reissue values of the old pictures. However, the Television Department reported on the progress of its experimental editing of two old westerns and stated that within

a very short time prints of these two experiments would be available for, consideration by managements. It may be that we will decide to release some of the very old pictures in this form.

"It was also pointed out that, the various forms of subscription, television such as phonovision, skiatron and telemeter might very well materially increase the value of all old product on television, and that if we release our pictures now to free television we would lose any possibility of this much greater revenue in the future. The whole question of releasing old product to television was resolved in the following manner:

*"The Television Dept. and the Sales Dept. will continue to watch the progress in this field and will report from time to time of any significant changes. If it ever becomes feasible on the basis of this information and the activities of other major companies, we will consider the question."*

These expressions are typical. Their value stems from the fact that they are contemporary memorials made for the use of the company and placed in their file without an eye to any possible future litigation. Indeed, the Government at the final argument, stressed the importance of such statements in this case which it denominated a "documentary case". The documents referred to and similar ones relating to other defendants

show that the producers were watching the market and the action of one another with the view of determining the proper time for the adoption of a *definitive* policy as to release of feature films for television.

The situation was summed up at the trial by Columbia's sales manager, Abe Montague, whose contemporaneous statements have already been referred to, in these words:

"This business is a very highly competitive business. We are in competition with our competitors continuously. We are often forced to change our policies, because they do not work out as well as we had hoped for, because our competitor has established something that is better and has been able to promote it. So we have a constant watching in this business, particularly, of what your competitor is doing, and weighing it in every way."

**B. Sales and Production for Television.**

At the same time some of the companies were releasing for television feature motion pictures which they had produced or in which they had an interest. Columbia, in 1954, released to television 16 westerns, 100 to 150 cartoons and some English pictures. In 1955 the company released 72 additional westerns. It has continued to offer to television a limited number of other pictures. The attached table shows the pictures made available to television in which Fox had an interest and the profits derived from such release:

## Television Statistics

| Licensed | Period of Release | Gross from Stations | Expenses Deductible | Distribution Fee | Net to Producers |
|---|---|---|---|---|---|
| 12/17/52 18 Wurtzels | 28 months to 4/30/55 | $587,809.32 | $30,632.70 | $137,494.16 | $209,841.23 |
| Average per picture | | 32,656.07 | 1,701.82 | 7,638.56 | 11,657.85 |
| 4/22/53 21 Charlie Chans | 23 months to 7/31/55 | 408,283.99 | 33,353.96 | 91,732.51 | 141,598.76 |
| Average per picture | | 19,442.09 | 1,588.28 | 4,368.21 | 6,742.80 |
| 4/22/53 23 English (Major) | 23 months to 7/31/55 | 154,919.19 | 17,228.22 | 33,822.74 | 51,934.11 |
| Average per picture | | 6,735.62 | 749.05 | 1,470.55 | 2,258.00 |
| 2/5/53 28 English (Gail) | 28 months to 8/31/55 | 367,189.40 | 28,552.43 | 91,797.37 | 123,419.74 |
| Average per picture | | 13,113.91 | 1,019.73 | 3,278.48 | 4,407.85 |
| 4/22/53 1 English— Uncensored | 24 months to 8/31/55 | 20,341.38 | 1,880.83 | 4,615.14 | 13,845.41 |

Note—In all situations shown above, except English—Uncensored, the net to producer is one-half of the proceeds after deduction of expenses and distribution fee. For Uncensored, the producer receives all income after deduction of expenses and distribution fee.

Advances have been made as follows:

| | |
|---|---|
| Wurtzel | — $250,000.00 |
| Charlie Chans | — 180,000.00 |
| English (Major) | — 100,000.00 |
| English (Gail) | — 120,000.00 |
| English—Uncensored | — —o— |

The above figures represent accumulations from first release to the specific dates in 1955 shown in the "Period Of Release" column.

Another defendant, RKO, began negotiations in 1951 with two national television networks, Columbia Broadcasting System and National Broadcasting Company, for the sale of its entire library of pictures on a bulk basis or for joint exploitation on a profit sharing basis. No satisfactory agreement could be reached although these negotiations covered long periods of time and continued up to July 1955 when control of the company and of its assets, including its library, was sold to persons interested primarily in the distribution of motion pictures for television. At the present time, Universal is negotiating for release to television of old westerns and other pictures.

In the meantime, some of the defendants have begun to produce and distribute *directly* motion pictures for television. The program as to the defendant Columbia, which began experimentally as far back as 1947, has reached a stage where, through Screen Gems, its wholly owned subsidiary, some 600 or 750 motion picture feature programs have been made for and exhibited on television in addition to short news and other programs. These pictures are produced in one of the studios on the Columbia lot and their distribution is direct, by means of "national sales" and "syndication sales" through eight special sales offices.

In 1952 the Board of Directors of Universal approved the establishment of a unit for the production by the company of pictures direct for television. This called for the production by the end of the calendar year of five complete series each consisting of thirteen units, at an aggregate cost of $1,287,000, or an average cost of approximately $20,000 for each unit. The first series was produced at a cost of $300,000. The venture proved disastrous. The series was sold for $15,000 and the project was never completed. Warner is also producing and distributing its own feature programs for television. Although some of their officers who testified in the case expressed doubt as to the future of the venture, this recent development indicates that the producers are still *trying* to meet the problems which free television has posed. It tends to justify their "wait and see" policy. For, in view of its possibilities, the potential value and the residual value of the backlog have been enhanced. And the most ardent advocates of pure competition have *not* gone to the romantic length of asserting that the owner of a copyright-protected product who may desire to market it himself must make it available to competitive distributors rather than hold the product *in reserve* for distribution by himself in its original or modified form. No principle of law would sanction such an attitude. Were it so it might, with equal cogency, be contended that a book publisher could be compelled by court decree to place at the disposal of the *cut-rate* book trade for sale as "remainders", *at reduced prices*, the books on his shelves for which sales by regular book sellers at *regular prices* are stagnating.

## C. The Testimony of Spyros Skouras.

It would unduly extend this opinion if we were to outline the testimony offered as to each of the defendants as to the origin of the restrictive policies of which the Government complains. The summaries already given indicate the attitude of the producers towards the problem and the considerations which led to its formulation. However, because of his position in the industry, his lifelong association with both motion picture production and theatre ownership and the thoroughness with which he analyzed the problem, the testimony of Mr. Spyros Skouras given at the trial best expresses the business motivations for the policy. It is, therefore, given in outline.

Mr. Skouras has been connected with the motion picture industry since 1914. He and his brothers began as owners of a single theatre in St. Louis, Mo., which later developed into a national chain. They still operate motion picture theatres in New York. Since 1942 Mr. Skouras has been the President of Fox. He

summed up the general policy of his company with respect to licensing feature films for television in this manner:

"We have been opposing, because we felt it will create an injury to our economic structure, *because we could not receive the price* that will compensate for the loss that we will sustain from our regular customers, the theatres.

"Frankly, to this day I was never approached by any important officer of any of the networks to negotiate seriously a proposition that could be given consideration. Always have in mind the necessity of an inventory of 55 to sixty million dollars annually, the live inventory, and we had to be as cautious as possible to protect the main source of our income, and they are the theatres in the United States and Canada and in the entire world."

After referring to the fact that when a picture is released it takes sixty-five weeks to be completely amortized he gave the essential facts which motivated his company's attitude towards television in these words:

"The television offers *its product gratis.* Our customers charge admission, and the market prices that they were offering to us, they were so inconsequential that the reissues quite often will gross, oh, eight to ten times the certain prices they were offering to us. * * *

"In our setup from time to time we have independent producers, and some of our independent producers, they insisted that there are films to be sold to television after their circulation was completed in the theatres. These films, and a number of films that we brought from Great Britain, that we made in the United Kingdom to meet the market requirements, and only a few of those films were exhibited in the United States.

"Now, together, the independent films and the Charlie Chan films,

which belonged to us exclusively, and these British made films by us, there were about 100 films, *they brought less income than one single reissue.* For instance, since 1946 the *income from reissues* and from films that quite often circulate after they are four years old, in nine and a half years brought almost *$20,000,000* income. "Now, *no one ever approached me to offer me anything like that sum of money.* * * *

"At no time the networks approached, at least, Twentieth Century-Fox to offer us sufficient money on a prime time. The impression we received from the inquiry from insignificant sources, not from the important people of the industry, they offered us off time, and *not the prime time.*

"Otherwise *they wanted to use an important industry, who is rendering great services, beyond that of the common man point of view, also from an information point of view, on the worst scale, as a makeshift to build up an industry, and to sell through advertisements, to see other products, so the motion picture industry would become an instrument of merchandising other people's products.*"

He concluded by stating that at the prices offered the sale of the motion picture features to television would amount to *"dissipating"* the assets of his company, and *"that the prices offered by television would not offset the loss in theatre revenues."* To the question "Of what importance to you are the theatre revenues?" he answered:

*"That is our existence. The theatres are our main outlets.* And in order to give you an idea, whether you take films of 10 years ago or presently, a picture like The Robe has already grossed in the United States over $16,000,000, and in the overseas market $7,000,000, and only about 25 per cent of the overseas market is affected. Now, if you give

that production gratis, it loses its value.

"Now, let me take a lesser film, Three Coins in a Fountain. Three Coins in a Fountain ultimately will gross in the United States over $6,-000,000.

"We just released a film with Clark Gable, The Tall Men. It will gross in the United States over $5,-000,000.

"*Our smallest pictures, their income since Cinemascope exceeds over a million dollars.* I think out of 44 pictures, six pictures will be less than a million and a half, the balance will be over a million and a half, in the United States and Canada. *"As I said before, the reissue of some of these films supply us an income of two million dollars a year average from 1946 to date.*

"Also another important factor, before last night I saw a wonderful production, The Rains of Ranchipur, which was a remake of The Rains Came of Louis Bromfield's famous bestseller. *If you sell that to television, you dissipate the value of that wonderful property.*

"*We would gladly pay at the present value of the market, for a property of that type, as high as half a million dollars.*

"We are making three to four films a year of old subjects. As a whole, television—it is inconceivable that tomorrow if the jet planes develop, that the automobile industry should be devoted for the exclusive promotion of the jet planes to the detriment of the automobile industry. The motion picture industry and the television industry, they are two distinct and separate instrumentalities. They both serve the community equally as well, but they serve it upon their own resources. They complement each other, they cooperate with each other, we need each other, but we should not sacrifice each other for the development of the other. And that is what we would have done if we would have made our films available at very insignificant prices, and to exhibit it to the world gratis.

"*The impact of television was so violent that the box office declined to such an extent that almost 6500 theatres closed their doors within three years' time.*

"During this period I received letters from the Middle West, *from many old friends who lost their theatres.* People that owned two and three theatres. *Their families and their children, that was their life, that was their career, and their theatres closed.* Now, that was a tremendous impact of television on the motion picture industry.

"The Court: Having given us that background, will you please answer directly the question? With that as a history, can you tell us what in your opinion would happen to a small exhibitor generally, not in a particular instance, if you adopted a *general policy of quick distribution of motion pictures to television, omitting the value of re-makes and re-issues, of which you have already told us.*

"The Witness: *Definitely the majority of the small theatres of America would close their doors.* At least eight to ten thousand.

"Q. By Mr. Mitchell: What is the margin of profit of the small theatre? A. Presently?

"Q. Yes. A. It is very small, Mr. Mitchell. Since television the theatre profits in the small theatres is a struggling industry. If it was not for the government to reduce the admission tax many more theatres would have been closed.

"Also the development of the wide screen, such as Cinemascope of the Twentieth Century-Fox people, plays such a great part. It revived interest of the people to go to the movies. It helps somewhat, but not

sufficient that we can say that the small theatres of America can be saved if the entertainment that they sell with admission later on is offered to the public gratis.

"*Q. How would the closing of these small theatres affect your revenues? A. Very substantially, to the point that we would be in the red.*

"*Q.* This policy of Twentieth Century-Fox with respect to licensing feature films to television, was that either adopted or carried out because of any request or pressure from exhibitor organizations, or exhibitors? *A.* The exhibitors and exhibitor organizations, yes, they tried their utmost to influence, *but I did not permit to be influenced by high pressure. We used our best judgment. For instance, when some of our independent producers needed the income from the television, we sold them. And when we, ourselves, before the introduction of Cinemascope, needed some income to improve our profit and loss state-*

*ment, we sold some of our pictures ourselves, and we so announced it.*"

### D. Additional Corroborative Facts.

The testimony just given exemplifies the attitude and the prudent and pragmatic business motivations of each of the producer-defendants. The summaries preceding it relate chiefly to defendants RKO, Fox and Columbia. However, there is similar evidence in the record as to the other two defendants, Warner and Universal. Some of it has already been given in outline.

No useful purposes would be served by any additional or more extensive summation of this cumulative evidence here. However, certain comparative charts prepared by the defendants are good summations of the actions of each of the companies as to the matters with which we are concerned in this case. While to some extent repetitious, they are reproduced here because they place in succinct juxtaposition the policies of the producer-defendants. The first of these is a comparison of the negotiations and sales of feature films to television.

Comparison of Defendants' Negotiations
and Sales of Feature Films to Television

| Company | 1948–1950 | 1951 | 1952 | 1953 | 1954 | 1955 |
|---|---|---|---|---|---|---|
| RKO | Various attempts to sell groups of features | Negotiations with CBS for entire backlog | Negotiations with Fox & Hyman | Various attempts to sell | Negotiations with Baird, Stanley Warner, Paramount, National Theatres, General Teleradio & NBC | Sale of RKO to General Teleradio |
| Columbia | Attempted to sell 2 recut, experimental features | | | | Licensed 16 features | Licensed 72 features; Negotiations with NBC |
| Twentieth Century Fox | | | Licensed 18 Wurtzel features | Licensed 21 Charlie Chan's & 52 English features | | |
| Warner Bros. | | | | | | Negotiated for sale of older features |
| Universal | 1948: Negotiations with CBS to sell 72 features 1949: Negotiations with NBC to sell 70 Rank films | | | | | Weintraub deal for 97 features; Negotiations with Hyman for 8 features |
| Republic | | Released over 100 features | Released 104 features | Released more features | | |

Another compares the defendants' 16mm tribution as of 1952:
programs and the methods of their dis-

### Comparison of Defendants' 16mm Programs as of 1952

| Company | Year Commenced 16mm Distribution | Method by Which Film Distributed | Locations Served |
|---|---|---|---|
| RKO | 1938 | RKO 35mm exchanges | Schools, shut-ins, churches, camps, and theaterless towns and theatrical locations not in competition with any 35mm theaters. No homes. |
| Columbia | 1948 | Various film libraries | All locations except those in substantial competition with Columbia's 35mm accounts. |
| Twentieth Century Fox | 1941 | Films, Inc. | Shut-ins, schools and theaterless towns not in competition with any 35mm theaters. No churches. |
| Warner Bros. | 1951 | Films, Inc. | Shut-ins, schools and theaterless towns not in competition with any 35mm theaters. No churches. |
| Universal | 1927 | United World (Universal subsidiary) | All Locations, including homes, not in competition with 35mm theaters. |

A third chart complements the one just given by illustrating graphically what already appears from the preceding discussion (V–A and B), namely, that, *despite some similarity*, there was *no identity* in the time or territorial limitations as to the various locations or as to the approval and rejection methods practiced:

### Comparison of Defendants' 16mm Programs as of 1952

| Company | Location Approval* | | Availability | | |
| | Non-Theatrical | Theatrical | Shut-Ins | Schools | Others |
|---|---|---|---|---|---|
| RKO | Prior approval by branch manager. | Prior approval by branch manager and RKO Home Office. | 6 months | 18 months | 18 months |
| Columbia | No prior location approvals, but reservation of right to cancel any location in response to a legitimate complaint by a Columbia 35mm account. | | No restrictions as to time once 16mm films released. | | |
| Twentieth Century Fox | Prior approval by Twentieth Century Fox. | | 9 months | 18 months | 12 months |
| Warner Bros. | Prior approvals by Warner Bros. | | 9 months | 18 months | 12 months |
| Universal | No prior approval. | Prior approval by Universal. | 6 months | 18 months | 18 months |

And finally, a chart shows the lack of uniformity even in the practice as to drive-in theatres, roadshow men and merchants' free shows:

### Comparison of Defendants' 16mm Policies on Drive-Ins, Roadshowmen, and Merchant Free Shows

| Company | Drive-Ins | Roadshowmen | Merchant Free Shows |
|---|---|---|---|
| RKO | Yes | No | No |
| Columbia | Yes | Yes | Yes |
| Twentieth Century Fox | No | No | No |
| Warner Bros. | Yes | Yes | No |
| Universal | Pre-1950 No Post-1950 Sometimes | Yes | Yes |

* Exhibits in the record show that one defendant often would approve a location which had been rejected by another defendant.

These additional data confirm the fact already apparent from the preceding exposition, that whatever similarity existed in the underlying policy was caused by the *identity* in the conditions to which it was applied (V–A). Which brings us back to the main problem, release of 16mm feature motion picture films to television.

· The Government has characterized the entire policy of the producers as to 16mm distribution as "a boycott" against certain types of exhibition. I cannot agree. Nor can I agree with the Government's contention that it is the duty of the motion picture producers to *supply television* with the entertainment material which it needs. It is not the function of a private industry to supply its product to a newly-arisen customer who is also a competitor and jeopard its interest in the continued existence of its old customers for whom the standard product is primarily made. After all, television is a new field, the phenomenal rise of which could not be anticipated. It was designed for a *distinct* and *different* form of entertainment which still supplies its main programs.

Because original entertainment material is costly and consumed and destroyed rapidly, television desires *to supplement it by using motion pictures*. But it does not offer to do so on terms commensurate or comparable with those which established theatres pay for the standard product. Instead of *competing* for the product, it *demands special terms*. For valid business reasons and because the entire 16mm business is a marginal by-product, motion picture producers have been unable to agree to television's terms, except in some specific instances. It would be inequitable to force agreement, especially when reluct-

ance, or even refusal to deal (*assuming that there was refusal*), was not only the result of separate determination by each company, but was *temporary*, was dictated by the sound economics of the situation, the wish to make the most desirable arrangements consistent with a fair protection of their interests and the refusal of the lately-arrived customer,—the television industry,—to commit itself to definite guarantees. *Both sides seem to have been playing for position. To some extent, they still are.* If, for this reason, interstate trade lags temporarily, the fact is proof of the vigor of the competitive spirit, even within an oligopolistic field.[33]

In my view, the actions of the defendants do not exceed the limits of choice of, or preference in, dealing allowed by law to one engaged in a private enterprise for profit. And the fact that the resulting act was the *same* as to all defendants *does not* spell concerted action or conspiracy. As said by the Court of Appeals for the Seventh Circuit:

> "*This action * * * does not prove or tend to prove that it was done by agreement * * * any more than proof that a hound is chasing a fox is evidence that the chase is by agreement with the fox.*"[34] (Emphasis added.)

It should be added that the entire policy of the producers as to 16mm films ante-dated any action, agitation or "pressure" (as the Government calls it), on the part of the trade organizations, TOA, Allied, or others named as co-conspirators. And, as fully appears from the preceding discussion,—it has been conducted *at times* in defiance of their opposition (IV–B and D). The occasional approval, after their occurrence, of phases of this policy, by some of the

33. See, William Fellner, 1949, Competition Among the Few, especially pp. 1–50, 286–311.

34. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 7 Cir., 1950, 182 F.2d 228, 233. This decision was reversed because the Supreme Court felt that there was evidence of agreement "to stop selling to particular customers". Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219. However, the language quoted applies aptly to a situation such as confronts us here.

named organizations cannot turn the independent, and, at times, dissimilar acts of the producers into an agreement or conspiracy with them.

## VII

### Summary and Conclusions

■ " * * * · *But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.* The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition ·or whether it is such as may suppress or even destroy competition. To determine that question the· court must *ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.* This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."[35] (Emphasis added.). " * * * Certainly even in those areas of economic activity where the play of private forces has been subjected only to the negative prohibitions of the Sherman ·Law, . 15 U.S.C.A. § 1 et seq., this Court has not held *that competition is an absolute.* See Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683." [36] (Emphasis added.)

■ What has gone before foreshadows the conclusion reached. However, in an opinion of this length, it is well to give *in summary* the ultimate grounds and reasons for the determination. Its theoretical basis could well be summed up in the two quotations which head this subdivision of the opinion. Although taken from opinions thirty-five years apart, they complement each other, and could well have been uttered in the same opinion. Indeed, Mr. Justice Frankfurter, the author of the later opinion, refers to the earlier opinion of Mr. Justice Brandeis. Rightly. For they both express the principle of reasonableness which the Supreme Court long ago read into the Sherman Anti-Trust Law,[37] and show continuity in its application over the years. So it may be postulated as accepted doctrine today that the reason why an agreement is not illegal unless the restraint flowing from it is unreasonable is that the antitrust laws *do not establish competition as an absolute.* Hence, many practices in interstate commerce are tolerated because, *although they restrain,* they do so reasonably. In each instance, the determination of the legality of a practice alleged to restrain must rest upon factors such as (a) the conditions, marketing and other, existing, or believed to exist, in the industry involved, (b) the economic and business considerations leading to the adoption of the practice, and (c) the end sought to be attained. These are, to use the phraseology of Mr. Justice Brandeis, "relevant facts" [38] which the ·court must consider, together with intent, in seeking to "interpret facts and predict consequences".[39]

35. Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 .S.Ct. 242, 244, 62 L.Ed. 683.

36. Federal Communications Commission v. RCA Communications, Inc., 1953, 346 U.S. 86, 92, 73 S.Ct. 998, 1003, 97 L.Ed. 1470.

37. See cases cited in Notes 5 and 6.

38. Chicago Board of Trade. v. United States, supra Note 35. .

39. Chicago Board of Trade v. United States, supra Note 35.

The facts in the case before us must be tested by these principles. Motion pictures, while essentially entertainment for profit, have also an educative value as a medium for the communication of ideas and are a method of expression protected by the free speech and free press guaranties of the First and Fourteenth Amendments.[40]

Historically, motion pictures have been made in 35mm film, the standard film for theatres, and gauged to the projection equipment used in theatres throughout the United States. From the theatres and the theatre-going public paying admissions to see motion pictures, the producers have received reimbursement for their costs of production and any profits accruing. Sixteen millimeter films are not *primarily or well* adapted to theatre showing. The demand for films of that gauge, first limited to home projection, rose during the war when most motion picture producers made films in that gauge for use by the Armed Forces and civilian organizations serving the diversion needs of persons in the armed services. During the war these films were furnished free to the Armed Forces. After the war, the demand increased and the defendant-producers began to exploit 16mm films as a by-product for additional revenue. However, the income from this source was always *insignificant* in comparison with the revenue from standard 35mm films. At all times, the exploitation of standard 35mm films through theatres has been the *main* source of the producers' income. Indeed, it has been and still is the *indispensable* source. For there is no foreseeable indication that television or media other than admission-charging commercial theatres could ever repay the production costs of feature films. Motion picture exhibition is primarily *paid* entertainment, while television, as it has developed in the United States, like ra-

dio, is chiefly an advertising medium in which motion pictures and other forms of *free* entertainment, are used to *merchandise* other persons' products. However, motion pictures and television do have one element in common,—they draw their patronage from a common source,—persons seeking diversion (and, perhaps, education) through these media. As the amount of money which the members of the common pool have to spend for this purpose is constant over the years, there is competition between various commercial amusement media for both the members and the money which they have to spend. There is uncontroverted evidence in the record that the rise of television has *affected adversely* theatre attendance and that many persons *would not pay* to attend the motion picture theatres if they could secure entertainment of a similar character and quality *free* in their homes. Whether the loss can be estimated mathematically is unimportant. The important fact is, using once more the apt phrasing of Mr. Justice Brandeis, that, in the minds of the producers, the impact of free television was "the evil believed to exist." [41]

Of the facts already detailed which induced this belief, the most significant were: (a) the desire to protect the interest of the producers in the chief source from which their income was derived,—the regular admission-charging theatres,—and to prevent the ruinous effect on it of overlapping non-commercial exhibition of sub-standard 16mm films, (b) the need to protect the unique and incalculable value of the producers' backlog for reissuance and remaking, rather than dilute, dissipate and exhaust it and destroy the stories from which the pictures were made by an accelerated exploitation through other than theatrical means,—including television, (c) the possibilities of subscription television and (d) the insignificance of the revenue to be derived presently from other than theatre exploitation as compared

40. Joseph Burstyn, Inc., v. Wilson, 1952, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098.

41. Chicago Board of Trade v. United States, supra Note 35.

with the losses, some predictable and some unpredictable, which the wider exploitation would entail. These are "legitimate business aims" and "competitive business considerations" of the type which the Supreme Court has recognized as warranting the adoption by prudent business men of restrictive plans of dealing.[42] Restrictive practices may violate the Sherman Act if they "abort yet unborn competitors,"[43] because the Act is aimed at the prevention of competition as well as its destruction.[44] However, the restrictions involved here are not of this character. They seek to protect the interest of the producers in the income from old, established customers, which had been in the past and would continue to be in the future, their *main* and irreplaceable source. A choice of this character is not an illegal exclusion of an actual or potential competitor. Rather it is a permissible preference of one over another of the kind which may result from any contract for "exclusive dealing".[45] The similarity between the methods adopted

"resulted from nothing more than a common business solution of identical problems in a competitive industry."[46]

▬▬▬ These facts, fully elaborated in this opinion, lead to the conclusion that the practices as to distribution of 16mm films of which the Government complains (a) were reasonable, (b) were established separately and individually by each producer to meet identical conditions, and (c) were not the result of any contract, concert, combination, or conspiracy on the part of the defendants among themselves or with the coconspirators or others to restrain commerce in 16mm films in violation of § 1 of the Sherman Act.[47]

Judgment will, therefore, be for the defendants that the plaintiff take nothing by its complaint against them or any of them and that the injunction and other relief prayed for therein be denied.

42. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 622–623, 73 S.Ct. 872, 888, 97 L.Ed. 1277.

43. Times-Picayune Pub. Co. v. United States, supra Note 42.

44. Associated Press v. United States, 1945, 326 U.S. 1, 13, 65 S.Ct. 1416, 89 L.Ed. 2013, and see, American Tobacco Co. v. United States, 1946, 328 U.S. 781, 789, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236.

45. Windsor Theatre Co. v. Walbrook Amusement Co., supra Note 30, 189 F. 2d at page 799.

46. Theatre Enterprises, Inc., v. Paramount Film Distribution Corp., 4 Cir., 1953, 201 F.2d 306, 313. And see, Rushing v. Metro-Goldwyn-Mayer Distributing Corp., 5 Cir., 1954, 214 F.2d 542. Apposite to the situation are the following words of the Supreme Court: "It was not the purpose or the intent of the Sherman Anti-Trust Law to inhibit *the intelligent conduct of business operations*, nor do we conceive that its purpose was *to suppress such influences as might affect the opera-* tions of interstate commerce through the application to them of the individual intelligence of those engaged in commerce, enlightened by accurate information as to the essential elements of the economics of a trade or business, however gathered or disseminated." Maple Flooring Mfrs'. Ass'n v. United States, 1925, 268 U.S. 563, 583, 45 S.Ct. 578, 585, 69 L.Ed. 1093. (Emphasis added) "The restrictions imposed by the Sherman Anti-Trust Act are not mechanical or artificial. We have repeatedly said that they set up the essential standard of reasonableness. * * We have said that the Sherman Anti-Trust Act, as a charter of freedom, has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions. Thus in applying its broad prohibitions, each case demands a close scrutiny of its own facts. *Questions of reasonableness are necessarily questions of relation and degree.*" Sugar Institute, Inc., v. United States, 1936, 297 U.S. 553, 597, 600, 56 S.Ct. 629, 641, 80 L.Ed. 859 (Emphasis added.)

47. 15 U.S.C.A. § 1.

Specific findings are indicated in the decision to be filed simultaneously.

Decision and Directions for Findings.

The above-entitled cause heretofore tried, argued and submitted, is now decided as follows:

Upon the grounds and for the reasons set forth in the Opinion filed this day, judgment will be in favor of the defendants that the plaintiff take nothing by the complaint against them or any of them, and that the injunction and other relief prayed for therein be denied. Formal Findings and Judgment to be prepared by counsel for the defendants under Local Rule 7. The Findings to include the specific findings hereinafter specified and such other findings as, in the light of the Opinion filed, are called for by the issues tendered by the pleadings and to which testimony was directed at the trial.

The Court makes the following specific findings:

**I**

The Court finds that the defendants have not contracted, combined or conspired among themselves or with any of their co-conspirators, whether sued in this action or not, or others, to violate Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, and/or to restrain interstate trade and commerce in 16 millimeter feature films in violation of Section 1 of said Sherman Anti-Trust Act.

**II**

More particularly, the Court finds that the defendants have not, pursuant to, and in furtherance of, any conspiracy or in violation of any of the laws of the United States, done or committed the following or any of the following acts set forth in the Complaint:

(1) Beginning some years prior to 1945, the exact date being unknown to the plaintiff, and continuously since 1945, the defendants, or their predecessors, and the co-conspirators herein named, have continuously been and now are engaged in an unlawful combination and conspiracy in restraint of the above-described interstate trade and commerce in sixteen millimeter feature films, in violation of Section 1 of the Sherman Anti-Trust Act. The defendants threaten to continue and will continue said offense unless the relief hereinafter prayed for in this complaint is granted.

(2) The aforesaid combination and conspiracy has consisted of a continuing concert of action among the defendants, their predecessors, and the co-conspirators herein named, pursuant to which defendants refuse to license the exhibition of sixteen millimeter feature films in any place or manner that would compete with the exhibition of 35 millimeter films.

(3) During the period of time covered by this complaint, and for the purpose of effectuating the aforesaid combination and conspiracy, the defendants did the things alleged in paragraph 28 hereof and entered into written and oral agreements containing restrictions hereinafter set forth, limiting the purposes for, locations at, times when, and conditions under which sixteen millimeter films may be exhibited.

(4) The aforesaid restrictions on sixteen millimeter feature film exhibitions consist of the following:

(a) Refusing to license any one to telecast sixteen millimeter feature films;

(b) Refusing to license others to exhibit sixteen millimeter feature films in locations which are open to the public within a zone, usually ten miles in radius, around any established 35 millimeter theatre;

(c) Restricting licenses for exhibition of sixteen millimeter feature films in churches, schools, clubs, hotels, and drive-in theatres by limitations upon admission prices, advertising, categories of persons to be admitted, or hours of showing.

(d) Imposing arbitrary and excessive clearances between the first release of a feature motion picture of 35 millimeter

width and its exhibition on sixteen millimeter film;

(e) Refusing to license others to exhibit sixteen millimeter feature films at free merchants' shows, taverns, or in coin-operated machines and refusing to license roadshow men;

(f) Reserving for each of the defendants severally, or for some of them jointly, the right to approve or disapprove each location for the exhibition of sixteen millimeter feature films produced or distributed by such defendant or defendants, before or after the licensing of such location by distributors or dealers, coupled with the right to arbitrarily abrogate any license granted pursuant to a given location approval; and

(g) Granting or withholding licenses to exhibit sixteen millimeter feature films in conformity with lists of locations "approved" or "disapproved" by the defendants or some of them.

(5) The defendants have maintained an intricate system to police and enforce, and with the assistance of the co-conspirators herein named, have policed and enforced, the license restrictions imposed upon exhibitors of sixteen millimeter feature films, and have blacklisted or boycotted exhibitors who disregard such restrictions.

### III

The Court finds that each of the defendant-producers imposed time and territorial restrictions as to the exhibition of 16 millimeter films as appears from the testimony outlined in the opinion and the charts listed under Subdivision 6–D of the Opinion.

### IV

These restrictions were arrived at separately and independently by each of the defendant-producers as the result of identical situations confronting them and were motivated by the desire of each of the defendant-producers to protect its income derived chiefly from standard film exhibitions at admission-charging theatres.

### V

The Court finds that there has been no refusal by the defendant-producers to exhibit to television. On the contrary, the defendant-producers have, at various times, released sixteen millimeter films to television, details as to which appear from the charts referred to in Finding III. There has been reluctance on the part of the defendant-producers to release motion pictures generally to television because of (1) the possible effect of their exhibition on standard pictures in admission-charging motion picture theatres; (2) the damage that the exhibition through television and otherwise, of sixteen millimeter films might have on the re-issue and remaking of motion pictures now in the vault of the defendant-producers; (3) the destruction of the value of stories from which the pictures and the backlog were made and the rights to which belong to the defendant-producers; (4) the inadequacy of the prices offered by television and any other exhibition of sixteen millimeter versions as contrasted with the income derived from the exhibition of the standard versions of said films.

### VI

Each of the defendant-producers for itself administered in its own way and through its own instrumentalities, the restrictions imposed on the exhibition of sixteen millimeter films.

### VII

The Court finds that the factors which governed each of the defendant-producers in the establishment of the restrictions and the measures taken to insure their observance by their customers were of the type which reasonable persons similarly situated would take into consideration in making such determination.

### VIII

The Court finds that the policy of the defendant-producers as to the exhibition of 16 millimeter films in its various phases was the result of meeting on business, economic and other reasonable

grounds, similar problems and that the policy in all its phases was independently arrived at, and was, on the whole, reasonable and did not result in an unreasonable restraint of trade and commerce in sixteen millimeter films. (See Exhibits A (Findings) and B (Judgment), which follow.)

## Exhibit "A"

### Findings of Fact and Conclusions of Law.

The above entitled action came on regularly for non-jury trial on September 22, 1955, before Honorable Leon R. Yankwich, Chief Judge of the above entitled Court. Plaintiff was represented by its attorneys Samuel Flatow, James M. McGrath, Daniel H. Margolis and Leonard R. Posner. Defendant Twentieth Century-Fox was represented by its attorneys Musick, Peeler & Garrett and O'Melveny & Myers and Homer I. Mitchell and Warren M. Christopher. Defendants Warner Bros. Pictures, Inc. and Warner Bros. Pictures Distributing Corporation were represented by their attorneys Freston & Files and O'Melveny & Myers and Homer I. Mitchell and Warren M. Christopher. Defendants Universal Pictures Company, Inc. and United World Films, Inc. were represented by their attorneys O'Melveny & Myers and Homer I. Mitchell and Warren M. Christopher. Defendants RKO Radio Pictures, Inc., Columbia Pictures Corporation and Screen Gems, Inc. were each represented by its attorneys Mitchell, Silberberg & Knupp and Guy Knupp, Macklin Fleming and Robert Rifkind.

On September 12, 1955, before any testimony had been taken, a consent decree was entered against defendant Republic Pictures Corporation and its wholly owned subsidiary, defendant Republic Productions, Inc. On September 22, 1955, before any testimony had been taken, a consent decree was entered against defendant Pictorial Films, Inc. and defendant Films, Inc. Defendants Republic Pictures Corporation, Republic Productions, Inc., Pictorial Films,

Inc. and Films, Inc. will hereinafter sometimes be referred to as "the consent decree defendants."

Evidence, both oral and documentary, was presented to the Court by the plaintiff and defendants. Having considered the evidence presented and having heard argument by plaintiff and defendants, the Court now makes the following Findings of Fact and Conclusions of Law.

1. Except where otherwise noted, facts found presently to exist have existed at all times which are material to the issues in this action.

2. (a) Prior to September 28, 1952, Twentieth Century-Fox Film Corporation was a New York corporation engaged principally in the business of producing and distributing motion pictures. On September 28, 1952, Twentieth Century-Fox filed with the Department of State of the State of New York a certificate changing its name to T.C.F. Film Corporation and ceased doing business. On December 1, 1952, a certificate of dissolution of T.C.F. Film Corporation was filed in the State of New York. On or about September 28, 1952, all of the assets of T.C.F. Film Corporation (except its United States theatre assets) were transferred to a new corporation named Twentieth Century-Fox Film Corporation, which thereafter carried on the business (except the United States theatre business) formerly carried on by the transferor. Said dissolved corporation and said new corporation will hereinafter be referred to as "Fox."

(b) Prior to February 28, 1953, Warner Bros. Pictures, Inc. was a Delaware corporation engaged principally in the business of producing motion pictures. On February 28, 1953, Warner Bros. Pictures, Inc. ceased doing business and was thereafter on March 11, 1953, dissolved. On or about February 28, 1953, all of the assets of said Warner Bros. Pictures, Inc. (except its United States theatre assets) were transferred to a new corporation named Warner Bros. Pictures, Inc., which thereafter carried on the business (except the United

States theatre business) formerly carried on by the transferor. Defendant Warner Bros. Pictures Distributing Corporation is a New York corporation engaged principally in the business of distributing motion pictures. All of its stock was owned by said dissolved corporation prior to February 28, 1953, and by said new corporation since said date. Said dissolved corporation, said new corporation and said distributing corporation will hereinafter be referred to as "Warner."

(c) RKO Radio Pictures, Inc. (hereinafter referred to as "RKO"), is a Delaware corporation engaged in the business of producing and distributing motion pictures.

(d) Columbia Pictures Corporation (hereinafter referred to as "Columbia"), is a New York corporation engaged principally in the business of producing and distributing motion pictures.

(e) Screen Gems, Inc. (hereinafter referred to as "Screen Gems"), all of whose stock is owned by Columbia, is a New York corporation engaged principally in the production and distribution of motion pictures for television.

(f) Universal Pictures Company, Inc. (hereinafter referred to as "Universal"), is a Delaware corporation engaged principally in the production and distribution of motion pictures.

(g) United World Films, Inc. (hereinafter referred to as "United World"), all of whose stock is owned by Universal, is a Delaware corporation engaged principally in the distribution of 16mm. motion pictures.

(h) Theatre Owners of America, Inc. (hereinafter referred to as "TOA"), Allied States Association of Motion Picture Exhibitors (hereinafter referred to as "Allied"), Independent Theatre Owners Association, Inc. (hereinafter referred to as "ITOA"), Metropolitan Motion Picture Theatres Association, Inc. (hereinafter referred to as "MMPTA"), Southern California Theatre Owners Association (hereinafter referred to as "SCTOA"), and Pacific Coast Conference of Independent Theatre Owners (hereinafter referred to as "PCCITO"), are trade associations composed of individual motion picture exhibitors or of local, regional, or state associations of motion picture exhibitors.

(i) The Council of Motion Picture Organizations, Inc. (hereinafter referred to as "COMPO"), is composed of organizations whose members are engaged in various phases of the motion picture industry.

3. Defendants Fox, Warner, RKO, Columbia and Universal will hereinafter sometimes be referred to as "the defendant-producers." TOA, Allied, ITOA, MMPTA, SCTOA, PCCITO and COMPO will hereinafter sometimes be referred to as "the alleged co-conspirators."

4. Each of the defendants transacts business and is found in the Southern District of California.

5. The following are definitions of terms used in these Findings of Fact and Conclusions of Law:

"Sixteen millimeter films" are motion picture films 16mm. in width, in contrast with "standard films" which are 35mm. in width. "Feature films" are motion pictures four or more reels in length other than those of strictly educational, religious or commercial character. "Theatres" are motion picture houses in which feature films are exhibited to the public for profit. "Theatrical exhibition" is any showing of a motion picture for the profit of an exhibitor. "Exhibitor" includes all persons, firms, corporations and public agencies engaged in the exhibition of motion pictures. "Clearance" is the period of time, stipulated in license contracts, which must elapse between runs of the same feature within a particular area or in specified theatres. "Availability" of a picture is the time or date, unilaterally fixed by a distributor, at which the picture is available for exhibition by an exhibitor having a license to exhibit the picture. "Merchants' free shows" are exhibitions of motion picture films sponsored by

merchants to enhance their goodwill and to obtain publicity. They are open to the public, no admission being charged. "Roadshowmen" are itinerant exhibitors who make a profit from showing motion pictures to the public for admission charges. "Coin-operated machine" is a mechanical device containing a 16mm. film, automatically projecting it upon insertion of a coin and arranged so as to make the projection viewable by one person at a time.

6. The defendant-producers have, since 1946, issued approximately 50% of the total feature films issued by the motion picture industry.

7. Sixteen millimeter films are not as suitable for theatrical exhibition as thirty-five millimeter films because when the gauge of the film is reduced from 35mm. to 16mm. there is a loss of clarity in the picture shown on the screen. No substantial number of theatres exhibiting 16mm. motion pictures commercially has ever existed or exists today in the United States. The trend in the motion picture industry today is to seek the enlargement of the vista beyond that provided by the standard 35mm. film by the use of larger gauges of film ranging from 55mm. to 70mm.

8. In formulating and carrying out their respective policies with respect to licensing 16mm. feature films, each of the defendants acted individually, independently and without any agreement,* understanding, contract, combination, conspiracy, concert of action, or conformance or adherence to any agreed or contemplated scheme, plan or pattern of conduct with each other or any other person. Said policies and actions were reasonable and were motivated by economic considerations, business require-

ments and market characteristics and more detailed findings are hereinafter made with respect thereto. The policies and actions of the defendants were not uniform and to the extent that they were similar, the similarity was the result of reasonable business solutions, independently arrived at, of identical problems and was not the result of any agreement, understanding, contract, combination, conspiracy, or concert of action among the defendants or any of them or with any of the alleged co-conspirators, nor was it the result of conformance or adherence to any agreed or contemplated, scheme, plan or pattern of conduct.

9. Television has had a rapid growth since the end of World War II.

(a) The number of television stations on the air increased each year from only 6 at the end of 1945 to 410 in 1954. During the same period, the average number of communities served by television stations increased each year from 3 in 1949 to 245 in 1954. The number of new stations provided between 1948 and 1952 was limited by the FCC's refusal to issue new station certifications.

(b) The number of television sets in use in the nation increased each year from about 10,000 in 1946 to nearly 28,-000,000 in 1954. The tremendous increase in the size of the accessible television audience greatly increased the value of television advertising to sponsors.

(c) The average number of broadcasting hours per station per week increased each year from about 58 in 1950 to about 100 in the 1953-54 years, an increase of over 70%.

(d) Expenditures on television advertising accounted for only about one per cent of advertising expenditures on all

---

* Each of the defendants, acting independently, made individual agreements with respect to the distribution of 16mm. film, such as agreements between the respective defendant-producers and distribution organizations like Films, Inc., United World, and Screen Gems, or with dealers, for the distribution of 16mm. film of a particular company. The plaintiff expressly stated at the trial that no claim was being made that any such individual agreement was unlawful in itself. It was reasonable for defendants, acting independently, to have made such agreements. The restrictions contained in these agreements were based on business considerations and were reasonable with respect to time, place, purpose and scope.

media in 1949, and were even more insignificant before that date. By 1954, expenditures on television advertising accounted for approximately ten per cent of all advertising expenditures. In actual dollars, expenditures on all television advertising were only about $58 million in 1949; these increased to about $810 million in 1954.

(e) In 1949 the industry spent about $33.1 million on program material, as compared to approximately $268 million in 1954.

(f) Expenditures by the television industry on feature films increased each year from $2.5 million in 1949 to nearly $22 million in 1954.

10. The value of feature films for use on television increased each year during the period 1949–1954. As the number of television stations has increased, television distributors paid increasing amounts per film to the sources that supplied them. In 1949, television distributors paid from $2,000 to $7,500 per feature for the best of the films shown on television. Today individual stations are paying as much as $8,000 for a feature film whereas their top price in 1950 was $700.

11. The policy-making officials of each of the defendants reasonably believed, based upon business considerations, that because of the growth of television, the prices paid for the use of feature motion pictures would increase and that it would be to the economic benefit of their respective companies to await such anticipated price increase.

12. The advent and growth of television has had a severe general impact on the motion picture industry.

(a) Rental of 35mm. feature films is the primary source of revenue for the motion picture producer-distributors. These 35mm. revenues consistently account for over 98% of domestic feature film rentals.

(b) Attendance at motion picture theatres declined about 38% between 1946 and 1954. The decline in weekly motion picture attendance was at its height in 1946–1948, when it fell off 12.5 millions. The decline was 6.2 millions in 1948–1950 and has continued at about that rate to the present time. The increase in television sets was greatest during the years when the decline in movie attendance was stabilized at a decline of approximately 6 millions during each two-year interval commencing in 1948. During that period, the population of the country was steadily increasing.

(c) Box office receipts declined about 33% between 1946 and 1954. Between 1948 and 1950, box office receipts decreased 12 per cent in television areas, while during the same period, receipts increased 2 per cent in non-television areas.

(d) The experience of 43 theatres in Denver, Colorado, and Los Angeles, California, indicate that both attendance and operating profits declined seriously with the establishment of new television stations. In Denver theatre attendance was relatively constant in the years between 1948 and 1952 during which time there were no television stations in the Denver metropolitan area. Between July, 1952, and the end of 1953 four new television stations had begun operations in Denver. Theatre attendance dropped about 20% during this first year of television in Denver, 12% more in the second full year, and continued to drop so that by mid-1955 theatre attendance had dropped over 40% from its 1948 level. Los Angeles was one of the cities to have television relatively early. The first station commenced in January, 1947, and six additional stations were added between August, 1948, and October, 1950. By the end of 1950 theatre attendance in Los Angeles was only about 65% of its 1948 level and it continued to drop through 1952. In 1953 and 1954 there was a slight upturn in attendance in Los Angeles, but 1955 reflects an attendance record lower than any experienced since 1947.

(e) The number of four-wall theatres in the United States has declined from 20,355 in 1945 to 15,039 in 1954. Some

of this decrease has been compensated for by the increase in the number of drive-ins from 102 to 4,062 during that period. However, some of the theatres were operating only part of the time in 1954. Moreover, in view of the increase in population, the statistics indicate at best a case of stagnation.

13. (a) The policy-making officials of each of the defendants reasonably believed, based upon business considerations, that the licensing of their respective company's feature motion pictures for telecasting would have had a serious adverse effect on their respective film rentals from 35mm. theatres. They further reasonably believed, based upon business considerations, that this loss in film rentals from theatres would not have been compensated for by the license fees which television would have been able to pay and would have paid for their respective company's feature films.

(b) The opinions of the policy-making officials of each of the defendants are corroborated by the audience survey conducted by Stanford Research Institute in four typical Western towns, namely, San Francisco, California, Portland, Oregon, Denver, Colorado, and Lubbock, Texas. Of the persons interviewed by the Institute in typical urban areas, 79.4% constituted what the Institute called the "common audience," i. e., persons who watched both motion pictures and looked at television. Twenty-two per cent of this "common audience" would attend motion pictures only approximately one-third as often if better quality older feature films were shown on television. Such a reduction in theatre attendance would have entailed, for the year 1954, a loss of $67.7 million in the domestic feature film revenue of all producers and distributors.

(c) The policy makers of each of the defendants were cognizant of the fact that the showing of better quality feature films on television would have caused losses to motion picture producers and distributors.

14. (a) Each year the defendant producers reissue a substantial number of films from their libraries. During the 1946–1954 period reissue feature films accounted for from 8% to 23% of the releases of the five defendant producers. The average gross playoff revenue per feature film issue during 1946–1954 ranged between $93,000 and $280,000. Direct costs of reissued films have been on the average only about 14% of gross reissue revenue.

(b) Between June, 1947, and 1955 the Realart Company, which distributed Universal reissues, received as film rentals for feature films the sum of $20,835,218.17. Of this amount Universal received as its net proceeds the sum of $6,816,429.84.

(c) Since 1946, RKO has received approximately $1,607,999.93 from King Kong.

(d) The telecasting of a feature film would destroy the value of a film for theatrical reissue, and the policy-making officials of each of defendants reasonably believed, based upon business considerations, that such was the fact.

(e) It is impossible to tell in advance what feature films may have reissue value or to fix a definite time beyond which a motion picture has no reissue value. The changing moods or fads of the motion picture audience, current events, the sudden rise to popularity of certain stars, the success of particular types of pictures and other factors may create a substantial reissue market for a picture which a brief time earlier appeared to have no reissue potential.

15. (a) Motion picture producer-distributors often produce feature films that are remakes of stories previously used. During the 1946–1954 period remade feature films accounted for from 3% to 10% of the releases of the defendant producers. Some feature films in the libraries of the defendant producers have a story value of as high as $500,000 for remake purposes.

(b) It is difficult, if not impossible, to tell in advance what motion pictures

have remake value. The changing moods or fads of the motion picture audience, current events, the sudden rise to popularity of certain stars, the success of particular types of pictures and other factors may create a substantial remake value for a picture which a brief time earlier appeared to have no potential as a remake.

(c) The telecasting of a feature film would destroy the value of a film for remake purposes and the policy-making officials of each of the defendants reasonably believed, based upon business considerations, that such was the fact.

(d) The policy-making officials of each of the defendants reasonably believed, based upon business considerations, that the licensing of feature films for telecasting would have caused a loss of reissue revenues and remake values which would not have been compensated for by the film rentals received from television.

16. (a) On March 16, 1948, the Screen Actors' Guild gave notice to the defendant-producers that no motion picture made for theatre exhibition could be exhibited on television without additional compensation to the actors. The defendant-producers take the position that they own the motion pictures which they have produced and that they have no obligation and will not undertake any obligation to pay their employees or former employees additional compensation if they license such pictures for telecasting. The impasse between the Guild and the defendant-producers stands unresolved. The Revised Basic Agreement of 1948 between the Screen Actors' Guild and the defendant producers contained a provision authorizing the Guild to cancel its contract on 60 days written notice if a producer shall license to television any film whose production was commenced after August 1, 1948. Subsequent agreements between the parties have contained a similar provision.

(b) The Screen Writers' Guild and Screen Directors' Guild have adopted an attitude similar to that of the Screen Actors' Guild with respect to the licensing of feature films for telecasting, and the defendant-producers take the same position as they do with respect to the Screen Actors' Guild attitude. The contracts between the defendant-producers and the Screen Writers' Guild and the Screen Directors' Guild contain provisions similar in effect to those contained in the Screen Actors' Guild contract.

(c) The contract between the defendant-producers and the American Federation of Musicians dated April 1, 1948, and subsequent contracts provide that no feature film, regardless of when it was made, shall be licensed for telecasting except with the prior written consent of the Federation and the Federation has given such consent only upon the conclusion of satisfactory financial arrangements.

(d) The policy-making officials of the defendants reasonably believed, based upon business considerations, that the demands of the various unions for additional compensation were an important factor to be considered in determining whether to license feature films for telecasting.

17. During the period from 1946 to 1955 there was increasing consideration as to the possibilities of subscription television and the possible revenue that might be derived therefrom. The policy-making officials of Columbia reasonably believed, based upon business considerations, that their company would be able to obtain a higher price for its library of feature films after the development of subscription television.

18. In formulating their respective policies with respect to licensing 16mm. feature films to television and in carrying out such policies, each of the defendants acted independently and reasonably, upon business considerations, including those set forth in Findings 9 to 17, inclusive. The policies and actions of the defendants were not uniform and to the extent that they were similar, the similarity was the result of reasonable busi-

ness solutions, independently arrived at, of identical problems and was not the result of any agreement, understanding, contract, combination, conspiracy, or concert of action among the defendants or any of them or with any of the alleged co-conspirators, nor was it the result of conformance or adherence to any agreed or contemplated scheme, plan or pattern of conduct.

19. The defendants have entered into various negotiations and transactions for the licensing to television of feature films in which they have an interest.

(a) During the period between 1948 and 1950 RKO made various attempts to sell groups of its feature films for telecasting. Between 1951 and 1954 RKO conducted negotiations for the sale of its entire library of feature films for telecasting with, among others, the following: Columbia Broadcasting System, National Broadcasting Company, General Teleradio and Matthew Fox and Elliot Hyman, who are television distributors. In 1955 RKO sold its entire library of feature films to General Teleradio.

(b) In 1949 Columbia attempted to license to television two recut feature motion pictures. In 1954 Columbia licensed 16 feature films for telecasting. In 1955 Columbia licensed 72 feature films for telecasting. During 1955 Columbia undertook negotiations with the National Broadcasting Company for the licensing of further feature films for telecasting.

(c) In 1952, Fox negotiated for the licensing of 18 feature films to a television distributor. Said films, in which Fox had an interest, were licensed for telecasting, with the consent of Fox. In 1953, Fox caused a wholly owned subsidiary corporation to license 73 feature films for telecasting.

(d) In 1955, Warner unsuccessfully negotiated with the American Broadcasting Company for the sale of a group of its older feature films.

(e) In 1948, Universal unsuccessfully negotiated with Columbia Broadcasting System for the licensing of 72 feature films. In 1949, Universal unsuccessfully negotiated with National Broadcasting Company for the sale of 70 J. Arthur Rank feature films. In 1955, and at the time of trial, Universal was nearing the completion of negotiations with Charles Weintraub, a television distributor, for the licensing of 97 feature films for telecasting. In 1955, Universal was negotiating with Elliot Hyman for the licensing of 8 features for telecasting.

(f) In 1951, 1952 and 1953, Republic Pictures Corporation licensed over 200 feature films for telecasting.

(g) No offer from television at a reasonably acceptable price was ever made to and refused by any defendant-producer.

20. Some of the defendants have produced and distributed motion pictures especially for television in an attempt to meet the perplexing problems which free television has posed.

(a) Columbia, which began producing pictures especially for television as far back as 1949, has now produced through Screen Gems between 600 and 750 film programs especially for television.

(b) In 1952, the Board of Directors of Universal approved the production of pictures especially for television. The Universal program called for the production by the end of 1952 of five complete series, each consisting of 13 units, at an aggregate cost of $1,287,000. The first series was produced at a cost of $300,000. That series proved unsuccessful and the project was never completed.

(c) Warner in 1955 was producing a regular one-hour television program called "Warner Bros. Presents."

(d) Fox in 1955 was producing a series of one-hour programs especially designed for telecasting.

21. There has been no refusal by the defendant-producers to exhibit to television. On the contrary, the defendant-producers have, at various times, released sixteen millimeter films to television, details as to which appear in Paragraph 19 of these Findings and in compila-

tions incorporated in Subdivision 6–D of the Court's Opinion.

There has been reluctance on the part of the defendant-producers to release motion pictures generally to television because of (1) the possible effect of their exhibition on standard pictures in admission-charging motion picture theatres; (2) the damage that the exhibition through television and otherwise, of sixteen millimeter films might have on the reissue and remaking of motion pictures now in the vault of the defendant-producers; (3) the destruction of the value of stories from which the pictures and the backlog were made and the rights to which belong to the defendant-producers; (4) the inadequacy of the prices offered by television and any other exhibition of sixteen millimeter versions as contrasted with the income derived from the exhibition of the standard versions of said films.

22. The actual or potential market for 16mm. films, in addition to television, includes the following, among others: (a) Armed Forces of the United States, Veterans' Hospitals and various other Government agencies, American Red Cross, and United Service Organizations, Inc. (USO); (b) theatreless towns, hotels, clubs, camps, roadshowmen, drive-in theatres, merchants' free shows, coin-operated machines, and private homes; (c) schools, churches, and charitable organizations; (d) hospitals, sanatoria, homes of the aged or disabled, and convents; (e) ships, trains and planes. These markets, (a) to (e), inclusive, are sometimes referred to collectively herein as "non-theatrical locations."

23. (a) Sixteen millimeter revenues were very small in relation to thirty-five millimeter revenues. In 1954 the domestic 16mm. revenues of the defendant-producers were $3,240,000 or less than 2% of their domestic thirty-five millimeter revenues which were $192,-332,000. RKO's 16mm. revenues are less than one per cent of its total revenues. Columbia's 16mm. revenues are approximately two per cent of its total revenues. Fox's and Warner's 16mm. revenues are less than two per cent of their total revenues. Universal's 16mm. revenues are approximately two and one-half per cent of its total revenues. The 16mm. revenues of the defendant-producers are even less significant when 16mm. revenues from Government sources are excluded.

(b) A 16mm. print is customarily used only two to four times per month due to delays in shipping and the intermittent character of exhibitions. Sixteen millimeter revenues per print per month range from $5 to $40. Thirty-five millimeter revenues per print per month range from $200 to $100,000.

(c) The policy-making officials of each of the defendants reasonably believed, based upon business considerations, that the 16mm. commercial business is a by-product and marginal business from which a small amount of additional revenues might be obtained but which should be administered so as not to lessen the revenues from 35mm. theatres.

24. The methods of 16mm. distribution of the defendants vary widely. Universal's 16mm. films are distributed through a wholly owned subsidiary, United World, which has branches throughout the country. RKO distributes 16mm. feature films through its 35mm. branch offices. Columbia distributes 16mm. feature films through a number of independent distributors and 16mm. libraries. Warner and Fox distributes through a single national distribution organization, Films, Inc.

25. Each of the defendants, acting individually, generally makes 16mm. films available upon a delayed availability, with the exception that Columbia has no restrictions as to the time of showing, once its pictures are released in 16mm. versions. The delayed availabilities adopted by Universal, RKO, Fox and Warner, acting individually, are from six to nine months after general release for shut-in locations and are in the neighborhood of 12 to 18 months after

general release for other locations. Each of the defendants acted reasonably and upon business considerations in adopting said availabilities, taking into account, among others, the following considerations: (a) Film rental; (b) Availability of prints; (c) The character and responsibility of the person to be entrusted with the film; and (d) Location of the nearest 35mm. theatre.

26. Each of the defendants adopted different policies with respect to whether prior approval by the company was necessary before the 16mm. distribution could commence to a given location. United World, which distributes Universal's 16mm. films, requires no prior location approval for non-theatrical locations which constitute 95% of its showings. United World does require prior approval for so-called theatreless towns. Warner requires prior location approval for all locations but it makes the decision at the home office and does not consult with the branch manager. Fox requires prior location approval and the recommendation of the branch manager is an important element in the process. Columbia requires no prior location approval for any location. RKO had prior location approval with the decision initially being made by the branch manager but being subject to review in the home office. Said actions were reasonable and based upon business considerations.

27. There was dissimilarity in the actions of defendants in rejecting or approving applications for the exhibition of 16mm. film at certain locations as is shown by the following compilations:

### RKO Radio Pictures, Inc.

Action of Other Companies Prior to July 22, 1952 on 2,107 Locations Rejected by RKO Radio Pictures, Inc. from 1946 to July 22, 1952

| | Twentieth Century-Fox Film Corporation | Universal Pictures Company, Inc. | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 497 | 209 | 67 |
| Rejected | 48 | 38 | 1 |
| No application | 1,562 | 1,860 | 2,039 |
| Total | 2,107 | 2,107 | 2,107 |

### Twentieth Century-Fox Film Corporation

Action of Other Companies Prior to July 22, 1952 on 2,651 Locations Rejected by Twentieth Century-Fox Film Corporation from March 10, 1941 to July 22, 1952.

| | RKO Radio Pictures, Inc. | Universal Pictures Company, Inc. | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 168 | 100 | 106 |
| Rejected | 48 | 125 | 9 |
| No application | 2,435 | 2,426 | 2,536 |
| Total | 2,651 | 2,651 | 2,651 |

## Universal Pictures Company, Inc.

*Action of Other Companies Prior to July 22, 1952 on 2,022 Locations*
*Rejected by Universal Pictures Company, Inc. from*
*1949 to July 22, 1952.*

| | RKO Radio Pictures, Inc. | Twentieth Century-Fox Film Corporation | Warner Bros. Pictures, Inc. |
|---|---|---|---|
| Approved | 273 | 486 | 52 |
| Rejected | 38 | 125 | – |
| No application | 1,711 | 1,411 | 1,970 |
| Total | 2,022 | 2,022 | 2,022 |

## Warner Bros. Pictures, Inc.

Action of Other Companies Prior to July 22, 1952 on 30 Locations Rejected
by Warner Bros. Pictures, Inc. from
August 1, 1951 to July 22, 1952.

| | RKO Radio Pictures, Inc. | Twentieth Century-Fox Film Corporation | Universal Pictures Company, Inc. |
|---|---|---|---|
| Approved | 2 | 16 | 5 |
| Rejected | 1 | 9 | – |
| No application | 27 | 5 | 25 |
| Total | 30 | 30 | 30 |

28. In formulating their respective policies with respect to licensing 16mm. feature films to non-theatrical locations and in carrying out such policies, each of the defendants acted independently and reasonably upon business considerations, including those set forth in Findings 23 to 27, inclusive. The policies and actions of the defendants were not uniform and to the extent that they were similar, the similarity was the result of reasonable business solutions, independently arrived at, of identical problems and was not the result of any agreement, understanding, contract, combination, conspiracy, or concert of action among the defendants or any of them or with any of the alleged co-conspirators, nor was it the result of conformance or adherence to any agreed or contemplated scheme, plan or pattern of conduct.

29. Each of the defendant-producers imposed time and territorial restrictions as to the exhibition of 16mm. films as appears from the testimony outlined in the opinion and the charts listed under Subdivision 6-D of the Opinion.

30. These restrictions were arrived at separately and independently by each of the defendant-producers as the result of identical situations confronting them and were motivated by the desire of each of the defendant-producers to protect its income derived chiefly from standard film exhibitions at admission-charging theatres.

31. Each of the defendant-producers for itself administered in its own way and through its own instrumentalities, the restrictions imposed on the exhibition of sixteen millimeter films.

32. The factors which governed each of the defendant-producers in the establishment of the restrictions and the measures taken to insure their observance by their customers were of the type which reasonable persons similarly situated would take into consideration in making such determination.

33. There was no agreement, understanding, contract, combination, conspiracy or concert of action with respect to 16mm. film between any of the trade associations of theatre owners named as co-conspirators or their members and any of the defendants. Said trade associations and their members urged the defendants from time to time to adopt a policy against the licensing of 16mm. feature films to television or to non-theatrical locations. However, the policy of each defendant with respect to 16mm. distribution, both to television and to non-theatrical locations, was adopted prior to the receipt of requests or recommendations from said trade associations or their members. The requests of said trade associations and their members did not determine and were not instrumental in determining the policies of the defendants and they did not cause any change at all in the defendants' previous business practices. The policies and practices of each defendant were arrived at independently and were not the result of yielding to any outside pressure or of acquiescence in any plan, program or suggestion advanced by said trade associations. On the contrary, the action of the defendants in licensing feature films to television and to non-theatrical locations, was taken in defiance of the requests of said trade associations and their members. This action by the defendants caused said trade associations and their members to complain bitterly to the defendants in a manner entirely inconsistent with the existence of any conspiracy or agreement between the defendants and the trade associations.

34. The defendants have not contracted, combined or conspired among themselves or with any of the alleged co-conspirators, whether sued in this action or not, or others, to violate Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, and/or to restrain interstate trade and commerce in 16 millimeter feature films in violation of Section 1 of said Sherman Anti-Trust Act.

35. More particularly, the Court finds that the defendants have not, pursuant to, and in furtherance of, any conspiracy or in violation of any of the laws of the United States, done or committed the following or any of the following acts set forth in the Complaint:

(1) Beginning some years prior to 1945, the exact date being unknown to the plaintiff, and continuously since 1945, the defendants, or their predecessors, and the co-conspirators herein named, have continuously been and now are engaged in an unlawful combination and conspiracy in restraint of the above-described interstate trade and commerce in sixteen millimeter feature films, in violation of Section 1 of the Sherman Anti-Trust Act. The defendants threaten to continue and will continue said offense unless the relief hereinafter prayed for in this complaint is granted.

(2) The aforesaid combination and conspiracy has consisted of a continuing concert of action among the defendants, their predecessors, and the co-conspirators herein named, pursuant to which defendants refuse to license the exhibition of sixteen millimeter feature films in any place or manner that would compete with the exhibition of 35 millimeter films.

(3) During the period of time covered by this complaint, and for the purpose of effectuating the aforesaid combination and conspiracy, the defendants did the things alleged in paragraph 28 hereof and entered into written and oral agreements containing restrictions hereinafter set forth, limiting the purposes for, locations at, times when, and conditions under which sixteen millimeter films may be exhibited.

(4) The aforesaid restrictions on sixteen millimeter feature film exhibitions consist of the following:

(a) Refusing to license any one to telecast sixteen millimeter feature films;

(b) Refusing to license others to exhibit sixteen millimeter feature films in locations which are open to the public within a zone, usually ten miles in radius, around any established 35 millimeter theatre;

(c) Restricting licenses for exhibition of sixteen millimeter feature films in churches, schools, clubs, hotels, and drive-in theatres by limitations upon admission prices, advertising, categories of persons to be admitted, or hours of showing;

(d) Imposing arbitrary and excessive clearances between the first release of a feature motion picture of 35 millimeter width and its exhibition on sixteen millimeter film;

(e) Refusing to license others to exhibit sixteen millimeter feature films at free merchants' shows, taverns, or in coin-operated machines and refusing to license roadshow men;

(f) Reserving for each of the defendants severally, or for some of them jointly, the right to approve or disapprove each location for the exhibition of sixteen millimeter feature films produced or distributed by such defendant or defendants, before or after the licensing of such location by distributors or dealers, coupled with the right to arbitrarily abrogate any license granted pursuant to a given location approval; and

(g) Granting or withholding licenses to exhibit sixteen millimeter feature films in conformity with lists of locations "approved" or "disapproved" by the defendants or some of them.

(5) The defendants have maintained an intricate system to police and enforce, and with the assistance of the co-conspirators herein named, have policed and enforced, the license restrictions imposed upon exhibitors of sixteen millimeter feature films, and have blacklisted or boycotted exhibitors who disregard such restrictions.

36. The policy of the defendant-producers as to the exhibition of 16 millimeter film in its various phases was the result of meeting on business, economic and other reasonable grounds, similar problems, and that the policy in all its phases was independently arrived at, and was, on the whole, reasonable and did not result in any unreasonable restraint of trade and commerce in sixteen millimeter films.

Conclusions of Law.

The Court concludes:

1. In all respects as set forth in the foregoing Findings of Fact.

2. The defendants have not contracted, combined or conspired among themselves or with any of the alleged co-conspirators or with the consent decree defendants or with others to violate Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, or to restrain interstate trade and commerce in 16mm. feature films in violation of Section 1 of the Sherman Anti-Trust Act.

3. The defendants have not violated Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.

4. Defendants are entitled to the judgment that plaintiff take nothing from them or any of them, and that the injunction and other relief prayed for be denied.

Let Judgment be entered accordingly.

Exhibit "B"

Judgment.

The Court having made its Findings of Fact and Conclusions of Law,

Now, Therefore, it is Ordered, Adjudged and Decreed as follows:

1. The defendants have not contracted, combined or conspired among themselves or with any of the alleged co-conspirators or with the consent decree defendants or with others to violate Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, or to restrain interstate trade and commerce in 16mm. feature

films in violation of Section 1 of the Sherman Anti-Trust Act.

2. The defendants have not violated Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.

3. Defendants are entitled to the judgment that plaintiff take nothing from them or any of them, and that the injunction and other relief prayed for be denied.